JAMES B. ARMSTRONG, PETITIONER, *v.* WAR CONTRACTS PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket Nos. 446–R, 755–R. Promulgated November 15, 1950.

*Frederick H. Koschwitz, Esq.*, for the petitioner.
*Frederick N. Curley, Esq.*, for the respondent.

## OPINION.

DISNEY, *Judge:* Briefly stated, the questions presented are whether the petitioner is a subcontractor, whether his earnings were excessive,

and as to the year 1944 whether the proceedings were instituted within the time prescribed by law.

Since the last question, as to limitation, determines whether we consider that year on its merits, we will first give attention to it. The petitioner's view, in substance, is that since on April 10, 1945, he declined to furnish the reports required by the respondent and again declined so to do on November 9, 1945, both times upon the ground that he was not a subcontractor under section 403 (a) (5) (B) of the Renegotiation Act, since the respondent did not act until May 9, 1947, and since section 403 (c) (3) of the Renegotiation Act provides that proceedings must be commenced within one year after the close of the fiscal year in question or within one year after the filing of the statement required by contractors or subcontractors, whichever is later, that the proceeding by the respondent is too late. He contends that by this limitation it was the obvious intent of Congress to avoid unnecessary hardship and inconvenience to any "proposed renegotiatee" by prescribing that proceedings shall be conducted without undue lapse of time. The proceedings should have been begun, petitioner contends, reasonably soon after receipt of his letters of April 10, 1945, and November 9, 1945. We can not agree. The respondent, of course, does not contend that the proceedings were instituted within one year after the end of the fiscal year so that question is not presented, but the other portion of section 403 (c) (3) provides a limitation of one year after the filing of the statement required by the subcontractor, which section 403 (c) (5) (A) requires to be filed within three months after the close of the fiscal year.[1] Petitioner by not filing the statement required by statute could not start the statute of limitations. It did not start to run until he filed the statements required. He cites no authority and we know of none to the effect that a statute of limitations, on its face beginning to run at the time of required action by a person, starts merely because that person, however much in good faith and however much reason he adduces, refuses to take such action, such as filing statements in this case. Obviously he could have filed the statements together with a contention that it was not necessary for him to

---

[1] The statute provides in pertinent part as follows:

No proceeding to determine the amount of excessive profits shall be commenced one year after the close of the fiscal year in which such excessive profits were received or accrued, or more than one year after the statement required under paragraph (5) is filed with the Board, whichever is the later, * * *

\* \* \* \* \* \* \*

Every contractor and subcontractor who holds contracts or subcontracts, to which the provisions of this subsection are applicable, shall, in such form and detail as the Board may by regulations prescribe, file with the Board on or before the first day of the fourth month following the close of the fiscal year (or if such fiscal year has closed on the date of the enactment of the Revenue Act of 1943, on or before the first day of the fourth month following the month in which such date of enactment falls), a financial statement setting forth such information as the Board may by regulations prescribe as necessary to carry out this section. * * *

do so and that he by filing them made no admission that he came within the law. The petitioner does not seem to contend that the respondent should have filed his proceeding within a year of the letters refusing to file the statements, but rather that the respondent should have filed his procedure within a reasonable time thereafter. We have before us a definite statute of limitation and the question of reasonable time, therefore, does not enter. The principle of laches is not applied. We hold that the renegotiation proceedings as to 1944 were not barred by the statute of limitation.

We next consider the question whether petitioner was a subcontractor within the purview of section 403 (a) (5) (B) of the Renegotiation Act of 1943,[2] since this question if determined for the petitioner would dispose of this matter for both 1943 and 1944.

The petitioner's contention is, in substance, that the language of section 403 (a) (5) (B) was never intended to apply to a person like himself, a manufacturers' representative who sold, and for years before World War II had been selling, commercial products for his principals, even though such products during the war years here involved were utilized in the performance of contracts with the Government, but that the language of the statute was intended to reach and cover "Washington sales representatives" and "war brokers," later called "5 percenters," and not commercial manufacturers' representatives. He appears to rely chiefly upon various expressions in statements made in the hearings before the Congressional committees. The respondent, on the other hand, contends that the petitioner is a subcontractor within the intendment of the Act, points to a report of the Committee on Naval Affairs, and contends that within the thought of the adjudicated cases the petitioner, having sold for his principals materials which had war end use and having received his commissions dependent upon the amount thereof, comes within the plain meaning of the statute.

We have studied at length statements and cases cited by both parties, and the history of the Renegotiation Acts, to ascertain, if possible, the Congressional intent underlying the text of the statute involved. We think we need not go into the details of Congressional procedure or the cases, and their bearing direct or indirect upon this problem. The

---

[2] (5) The term "subcontract" means—

(A) Any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of any other contract or subcontract, but such term does not include any purchase order or agreement to furnish office supplies : or

(B) Any contract or arrangement other than a contract or arrangement between two contracting parties, one of which parties is found by the Board to be a bona fide executive officer, partner, or full-time employee of the other contracting party, (i) any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract of subcontracts, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (ii) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts :  *  *  *

general question as to meaning of subcontract and the length to which renegotiation was intended to go was considered (though the case does not primarily involve the particular language here in question) in *Providence Wool Combing Co.* v. *Secretary of War*, 14 T. C. 979.[*] Other cases give us some general light upon this question. Section 403 (a) (5) (A) includes in "subcontract" purchase orders or agreements to perform all or any part of the work, or to make or furnish any article, required for the performance of any other contract or subcontract, and subsection (B) includes, in substance, in "subcontract" any arrangement, any amount payable under which is contingent upon procurement of a contract or contracts with a Department or of a subcontract or subcontracts, or determined with reference to the amount thereof, or under which any service performed consists of soliciting or procuring contracts with a Department or a subcontract with a Department, or subcontracts. Though there are to be found various expressions in the hearings before Congressional committees with reference to what the petitioner calls Washington agents, war brokers and 5 percenters, and we have no doubt that they were intended to be included perhaps primarily under the statute, from an examination of the whole history of this matter we are not convinced that the petitioner's activities do not come within the language and purview of the statute and the intendment of Congress.

In the *Providence Wool Combing* case, *supra*, we said:

> Review of the legislative hearings which preceded and attended the adoption of the definition of subcontract convinces us that in this proceeding it is correct to adopt the views previously expressed by this Court that "The statutory definition of a subcontract is extremely broad," *Grob Brothers*, 9 T. C. 495, 501; and that "the mischief at which the legislative remedy was aimed required that the term 'subcontract' be used so as to sweep into the scope of the legislation all activities directly related to production for the war-making Departments"; and that this could not be done without including articles "bought primarily for the purpose of producing products with a *war-end use.*" [Emphasis added.] *National Electric Welding Machines Co.* [10 T. C. 49] * * *

Elsewhere in the same case we noted that Congress understood the term subcontract "extended to orders for materials which were to be a component part of, or incorporated into an article which was made under Government contracts." Though we are not here dealing with the petitioner's principals manufacturing war end materials, we are dealing with "orders for materials," which he procured for his principals, and which were devoted to a war end use under the facts before us—and the amounts payable to him were contingent upon the procurement of the contract for such materials, that is, subcontracts, and he procured such contracts for his principals. A footnote to the

---

[*] We are conscious that that case involved primarily matters in 1942 but the examination entailed the same general question as here involved and the Renegotiation Act of 1943 was particularly examined.

*Providence Wool Combing* case, quoting a House Report of the Naval Affairs Investigating Committee on Renegotiation, touches upon the point which the petitioner here appears specially to stress, that is, that commercial sales should not be considered within the statute. The argument was considered to have no merit and it was pointed out that figures presented to the committee demonstrate the increased and excessive profits made by the manufacturers of standard commercial products as a result of greatly expanded volume—due to the war. The report of the Committee on Naval Affairs above referred to refers to the fact that the expense of selling commissions and fees in respect to subcontracts "must ultimately be borne by the taxpayers." Though the petitioner argues that this refers only to "Washington agents" or "war brokers" who did practically no commercial selling, we can not think that this demonstrates intent to exclude the expense of commercial selling of materials with war end use. It is clear, as pointed out in the report of the Naval Affairs Investigating Committee above referred to, that excessive profits might during the war have resulted from the selling of standard commercial products, because of the war-inflated volume and in this case therefore expand the commissions based on the amount of such sales. Without further discussion or citation of the various cases, we conclude and hold that the language of section 403 (a) (5) (B) covers the petitioner as a subcontractor and that his commissions under the facts before us are subject to renegotiation.

We come now to the question whether petitioner's earnings were excessive profits under the Renegotiation Act to the extent determined by the respondent. It was determined that for the year 1943 there was excessive profit in the amount of $25,000 ($22,727.09 after proper adjustment on account of taxes other than Federal tax measured by income), and that there was excessive profit to the extent of $7,500 in 1944. The petitioner's argument on this issue may be summarized as follows: That the rate of the commissions received by him was the same as those received by him for many years and was substantially the same as paid other salesmen similarly situated; that though he received substantially increased earnings in 1943 and 1944 over those received in earlier years, they were "not entirely attributable to war business," and that they were received in part due to the years he had spent in developing his territory and through hard work and careful attention to servicing his accounts. He argues also that in the renegotiation of his principals no exception was taken to his commissions and they were not disallowed, reduced or objected to in any way. The respondent argues, on the other hand, that the rate of commissions is not important, the statute being interested only in the amount and whether that amount is excessive; that it is immaterial that petitioner's commissions were not excepted to or adjusted in the renegotia-

tion of his principals, for he was not therein being renegotiated; that the record refutes the petitioner's contention that his increase in earnings in 1943 and 1944 were not attributable to the war; that his earnings in the years here involved were, due to the war, far higher than his average earnings in previous years and did not result from his efforts; that his wartime and peacetime operation was the same; that he took no risks, shows no investment except that he maintained an office with one employee; and that he rendered no engineering or other service.

After analysis of these arguments and study of the facts before us, we think it is apparent that the petitioner's commissions during 1943 and 1944 were far greater than his average earnings prior thereto. It is stipulated that his average earnings for the period 1936–1939 were approximately $9,500, whereas his net income, after expenses from business, allocable to war end use was for 1943 $56,918.69 and for 1944 was $25,233.41. We think it is obvious that the matter of rate, stressed by the petitioner, is not controlling for the objective of the statute is inquiry into the amount, as to whether it is excessive. Petitioner errs also, in our opinion, in the view that the fact that renegotiation of his principals did not involve any exception, disallowance, reduction or objection to his commissions, "is strong indication" that the renegotiation agencies considered his commissions legitimate, and reasonable compensation. His commissions were actual expense to his principals and he was not being renegotiated. The Renegotiation Act was not intended to lump together the renegotiation of petitioner and his principals, and we are unable to give effect here to the fact that these expenses were not questioned in the renegotiation of the principals. Nor do we think that the fact that the rate of commissions received by the petitioner was the rate ordinarily paid to the petitioner and to salesmen similarly situated indicates that his commissions were not excessive in amount. We have indeed before us no evidence showing comparison of amounts earned by petitioner and those in similar situations. As above stated, the amount and not the rate is the element of importance under a statute inquiring into the effect of the war as to possibly excessive profits.

We have in this matter made the examination required of us by section 403 (a) (4) (A) of the Renegotiation Act of 1943, considering petitioner's efficiency, reasonableness of profits with regard to volume of production, normal pre-war earnings in comparison to war and peacetime production, the extent of risk assumed by him, and all other factors suggested by the statute. As already indicated, we do not agree with the petitioner's views above examined on this issue. It is apparent, however, from the record before us that not all of the increase in petitioner's earnings during the war years here involved was

due solely to the war. The evidence indicates clearly that though the major portion of the increase in his earnings was attributable to war, some portion of the increase was due to his efforts and years of experience in developing his territory. This factor the respondent opposes with the thought that a large percentage of his sales was repeat orders and that his principals were due to the war operating at capacity. In our opinion, it may not with fairness and logic be eliminated. Considering all of the evidence, therefore, we conclude and hold that the profits of the petitioner were excessive for the year 1943 in the amount of $22,500 and for the year 1944 they were excessive in the amount of $6,750. These figures take no account of adjustment for taxes.

Reviewed by the Court.

*Orders will be issued accordingly.*