QUARTZ LABORATORIES, INC., A CORPORATION BANKRUPT, WILLIAM B. BOSTIAN, TRUSTEE IN BANKRUPTCY, PETITIONER, *v.* SECRETARY OF WAR AND/OR WAR CONTRACTS PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket No. 332–R.   Promulgated October 18, 1948.

*Frank P. Barker*, Esq., for the petitioner.
*William V. Crosswhite*, *Esq.*, for the respondent.

632

**OPINION.**

ARNOLD, *Judge*: The fundamental question here is whether Quartz had excessive profits in the taxable year. The answer depends upon whether all or only a part of the $139,098.82 paid by Quartz for execu-

tive, managerial, engineering, and expediting services should be considered as an element of cost in carrying out its war contracts. The parties are agreed that the contracts are renegotiable and that the amount of Quartz's net renegotiable profits for 1943, before compensation for the above services, is $175,067.61.

Petitioner contends that the compensation paid its officers, and John H. Cashman for expediting services, was reasonable and should be taken into account as part of the cost of fulfilling its contracts. It is contended that the officers had no fixed salaries other than the arrangement to pay them compensation based upon a percentage of gross revenue. It is further contended that the amounts paid in the taxable year covered services rendered in the second and third years of operation and that the sales of the latter years should be considered in determining the reasonableness of compensation paid in the taxable year.

Respondent contends that Quartz had excessive profits for the taxable year of at least $60,000; that a reasonable compensation for managerial and executive salaries is $35,000; that Quartz's net profit subject to renegotiation, after allowing $35,000 for managerial and executive salaries, is $140,067.61; that consideration of all the pertinent factors in connection with petitioner's operations discloses the existence of excessive profits; and that sales for subsequent years are immaterial in determining whether Quartz realized excessive profits in the taxable year.

We have found as a fact that Quartz realized excessive profits on its war contracts for the taxable year. We have further found that the amount of such excessive profits was $60,000. We base our findings upon a careful examination and a full consideration of the evidence offered by the parties. It is unnecessary to review all the facts that we considered in reaching our conclusion. We shall, however, discuss in the succeeding paragraphs some of the facts and testimony which convinced us that Quartz realized excessive profits of $60,000 during the taxable year 1943.

One of the points relied upon by petitioner to justify the compensation paid to the various individuals is that the manufacturing technique was extremely complex, requiring great skill. In our opinion the evidence is to the contrary. Petitioner admitted that respondent's witness, Johnson, was an expert in the manufacture of quartz crystals. During the war Johnson was the assistant or was in charge of the quartz crystal section of the Signal Corps. He was familiar with production and procurement problems of the crystal manufacturers. Among other plants, he visited that operated by Quartz. He testified that the 171–B crystal was "probably the easiest crystal that the Signal Corps was having made for it at that time"; that the Signal Corps

furnished technical service, expediting service, assistance in obtaining orders, and operated a school for training personnel, all for the assistance of crystal manufacturers and without cost to them; that the position or standing of Quartz in the industry was "ordinary"; that the period between the organization and the first delivery of crystals by Quartz was "about average; about 90 days"; that with the machinery known to the trade at the time, the production of quartz crystals was "a straight-forward production line matter" and that the precision machines used in the manufacturing process were "relatively simple to operate"; that the Quartz plant "looks just like every other crystal plant I have ever been in"; that a fair average price for the 171–B type crystal in 1943 would be $6.50; that reasonable compensation for the managerial services of a company like Quartz would be $35,000; that a reasonable amount of profit for such a company to retain in its business for a year like the fiscal year 1943 of Quartz would be $60,000; that approximately 18,000,000 crystals were made in 1943 and 28,000,000 in 1944; that Quartz's payment to Cashman was the only instance he knew of in the industry where a person in the employ of a prime contractor received money from one of the latter's subcontractors; that he considered the payments "highly unethical"; that he reported the matter to Washington and within a matter of days Hallicrafters' officials were called into Washington; that it is one of the duties of expediters of prime contractors to give every possible assistance or take every possible step to secure equipment for the use of war industries and that such knowledge was passed on to subcontractors.

The several witnesses appearing for petitioner did not, in any way, refute the testimony of Johnson. Much of their testimony is to the same effect as his. We can not agree, therefore, that the manufacturing technique was extremely complex, requiring great skill. The wages paid employees would also seem to refute this contention. In 1943 an employer could not secure skilled technical employees to do an extremely complex manufacturing job requiring great skill for 50 cents an hour. Nor could the employer secure supervisors for such skilled employees for 85 cents an hour. Furthermore, it is extremely unlikely that Hukill, the production manager, could have managed such a complicated manufacturing operation with no more technical knowledge than he had. It is an established fact that only Ziegler had the technical "know-how" requisite to set up the manufacturing plant. Ziegler testified that he never supervised the operations, but depended upon Hukill to follow his instructions.

Petitioner points out that the capital employed was for the most part private capital and that public capital was amply secured by the endorsements of its officers of the risk assumed. Our findings show that only $5,000 was invested in the business. The remaining funds

used by Quartz in its operations were secured by interest-bearing loans from the Williamses and from a bank upon George L. Williams' endorsement of the note. With an original investment of $5,000 and a daily average borrowed capital of $21,990, Quartz ended the fiscal year 1943 with a surplus of $7,479.60 according to its balance sheet. The surplus item of $7,479.60 is the same as the alleged profit for the year if the net renegotiable profits of $175,067.61 are reduced by compensation payments of $139,098.82 and state and Federal taxes of $28,489.19 shown on the balance sheet. It is urged that this profit of $7,479.60 on the invested and borrowed capital is not an excessive profit when net sales totaled $651,824.15. The fallacy in this argument is that Quartz's profits for 1943 were far in excess of $7,479.60.

Analyzing the services rendered by the various individuals receiving compensation from Quartz, we find only one who devoted his full time to its affairs, Ralph Hukill. He brought to Quartz a willingness to work. He had no engineering, technical, or managerial experience to offer. His earning ability prior to the fiscal year 1943 was less than $3,300 per annum. Yet, he received over $33,000 from Quartz for his services. Obviously, it was not Hukill's qualifications or ability that commanded this salary or compensation; it was the war contracts plus the profit-sharing agreement with Williams, Ziegler and Cashman.

The compensation of $24,816.09 paid Jessie Hukill was intended primarily for Ziegler. Nevertheless, Williams testified to services rendered by Jessie Hukill in an effort to justify this disbursement to her. The facts disclose, however, that she was a conduit for money paid Ziegler for his services. The record indicates that Ziegler was not too well pleased with the amount received after the taxes payable by Jessie Hukill were deducted therefrom. Ziegler's services to Quartz were, of course, valuable. He was the only person connected with Quartz who knew how to manufacture crystals. Hukill depended upon Ziegler for instructions. Ziegler spent some time setting up the plant and getting it started, but thereafter he devoted very little time to Quartz. Hukill testified that Ziegler probably visited the plant once each day for a few minutes during the first month and that he spent less and less time there as the plant progressed. Ziegler testified that his principal services to Quartz were rendered before and while the plant was being set up. Johnson testified that a good crystal engineer could lay out a crystal manufacturing plant in two or three days. Ziegler testified that he used a similar set-up to that used by his Crystal Products Co. Here, again, it seems plain that the compensation for Ziegler was based not so much upon the value of his services as upon the agreement as to how war contract profits would be split. Ziegler, unfortunately, could not receive Jessie Hukill's compensation tax-free, and after taxes were deducted the compensation for his services

was much less proportionately than Williams' and Hukill's, who knew nothing about manufacturing crystals. Ziegler's dissatisfaction with his cut under the arrangement is not difficult to understand.

The compensation of $22,001.09 received by Aileen Williams for the services she rendered Quartz is clearly unreasonable. The services she rendered have been detailed in our findings. We have no doubt that she aided the business in every way she could. She had a small investment therein which she would naturally protect. But no reasonable person would pay her $22,000 for equipping and furnishing the women's smoke and rest rooms, recruiting some women employees, buying a box of candy for certain employees as a work bonus, and helping to maintain the employees' morale. She was recompensed for her financial assistance to Quartz by the interest paid on her loan. We are convinced, therefore, that the compensation paid Aileen Williams for her services was unreasonable.

Quartz paid George L. Williams $25,629.72 for his services to it. Williams was a full time employee of the Thornton and Minor Clinic in Kansas City and was also an employee of the Cleary Clinic of Excelsior Springs, Missouri. He testified that his principal services to Quartz were in organizing and financing it. His business connections enabled him to accomplish a number of things for the benefit of Quartz. His services were rendered principally over a three-month period and thereafter he devoted very little time to Quartz. He rented a building to Quartz and loaned it money at interest. He rendered some valuable service to Quartz, but, like his associates Hukill and Ziegler, his compensation rested on the agreement dividing war contract profits rather than the value of his services.

Some measure of the value of Cashman's services to Quartz, if any, can be gained from the salary paid him by Hallicrafters. He testified that he traveled 75 per cent of the time all over the United States for Hallicrafters and received a salary of $8,100 per annum. He also testified that he was interested in two other companies that had subcontracts with Hallicrafters. Plainly Cashman could devote very little time to Quartz. Yet, he drew about four times the compensation from Quartz that he did from Hallicrafters. Johnson testified that the Signal Corps provided expediting services for crystal manufacturers and that prime contractors provided like services for their subcontractors. Part of Cashman's duties with Hallicrafters was to do exactly the things for which he charged Quartz. Another point against the reasonableness of Cashman's compensation is to be found in the amount of equipment purchased. Quartz's balance sheet shows its equipment account at the end of the taxable year 1943 as $22,914.40. Cashman was supposed to have expedited the acquisition of this equipment in consideration for the payments made to him.

The testimony shows that he did not expedite all of the equipment. Some of it was acquired from Crystal Products Co., some of it was improvised, and some of it was expedited by Cashman. Cashman, therefore, devoted not more than 20 per cent of his time to Quartz, expedited not more than $20,000 of its equipment, and received a salary of only $8,100 from his principal employer, but petitioner claims, nevertheless, that the $33,113.75 paid him during the taxable year was reasonable compensation for services rendered. To limit ourselves, as we do, to a holding that petitioner's contention is unconvincing, is a clear understatement of the facts.

Finally, petitioner contends that the compensation paid in the taxable year covered services rendered in the second and third year of operation and that the sales of the latter years should be considered in determining the reasonableness of the compensation paid in the taxable year. Petitioner cites no authority in support of this contention, nor has research developed any authority therefor. On the contrary, the Renegotiation Act, as amended,[1] provides that the Board (respondent herein) "shall exercise its powers with respect to the aggregate of the amounts received or accrued *during the fiscal year* * * * by a contractor or subcontractor * * *" (sec. 403 (c) (1)); and that, "This subsection [subsec. (c)] shall be applicable to all contracts and subcontracts, to the extent of amounts received or accrued thereunder *in any fiscal year ending after June 30, 1943*, whether such contracts or subcontracts were made on, prior to, or after the date of the enactment of the Revenue Act of 1943 * * * [sec. 403 (c) (6)]." (Emphasis supplied.) These and other references in the Renegotiation Act, together with statements contained in the committee hearings and the Joint Statement of Renegotiating Services, show that Congress intended excessive profits, as defined in the Renegotiation Act, to be determined on the contractor's or subcontractor's fiscal year basis. The sales of the second and third years can not, in view of the foregoing, be considered in determining the reasonableness of the compensation paid in the taxable year.

In reaching our conclusion that Quartz realized excessive profits on its war contracts in the taxable year, we have taken into account the various contentions advanced by petitioner and the evidence received with and without objection. We have made no attempt to determine what amount constituted a reasonable salary for the services rendered by each of the aforementioned individuals. We have made no attempt to determine precisely in dollars what their total reasonable compen-

---

[1] Sixth Supplemental National Defense Appropriation Act of 1942, ch. 247, 56 Stat. 226, Public Law 528, 77th Cong., 2d sess., as amended. Amendments found in section 801, Revenue Act of 1942; the "Military Appropriation Act of 1944," approved July 1, 1943, Public Law 108, 78th Cong., 1st sess.; and Title VII, Revenue Act of 1943.

sation would be. It is sufficient for present purposes to hold that the compensation paid them was unreasonable for the services they rendered in the taxable year; that to the extent that such compensation was unreasonable it should not be allowed as a part of the cost of Quartz's war contracts in the taxable year; that no part of the compensation determined to be unreasonable for the taxable year can be allocated to the sales for subsequent years; that by virtue of this reduction in the costs of its contracts Quartz had excessive profits in the taxable year 1943; and that, in our opinion, the excessive profits for the taxable year 1943 were $60,000.

*An order will issue in accordance herewith.*