CONNECTICUT MARINE BOILER WORKS, PETITIONER, *v.* SECRETARY (CHAIRMAN) MARITIME COMMISSION, RESPONDENT.

Docket No. 447–R. Promulgated February 15, 1951.

*Benjamin A. Mahler, Esq.,* for the petitioner.
*John F. Wolf, Esq.,* and *James H. Prentice, Esq.,* for the respondent.

OPINION.

Hill, *Judge:* The first question for our determination is whether respondent commenced renegotiation of those war contracts of petitioner completed during petitioner's fiscal year ended December 31, 1942, within one year from that date in accordance with the provisions of section 403 (c) (6) of the Renegotiation Act of 1942.[1] It is respondent's contention that renegotiation commenced with the conference held between the representatives of petitioner and respondent on December 14, 1943, and therefore it complied with section 403 (c) (6). On the other hand, petitioner asserts that renegotiation did not begin until August 11, 1944, when respondent wrote to petitioner stating that in its opinion petitioner had realized excessive profits of $47,000 from renegotiable business during 1942. In any event petitioner contends that renegotiation did not commence before the close of 1943.

Since the question is whether there was a commencement of renegotiation during the year ended December 31, 1943, we need only determine whether upon the occurrence of the conference on December 14 of that year renegotiation proceedings had commenced.

In petitioner's view the purpose of this conference was merely for the production of further information to enable respondent to determine whether or not it should begin renegotiation, and thus the meeting constituted simply a step preliminary to the start of renegotiation. It points out that the telephone call from respondent on December 10, 1943, requested a meeting to provide a further breakdown of the initial figures submitted by petitioner in the "Standard Form of Contractor's Report" regarding the year 1942. Petitioner asserts that it was never specifically notified at the conference that this was the commencement of renegotiation or that a review of its profits from renegotiable business was being made to determine the extent that they were excessive. Moreover the mere fact a Price Adjustment Board was asking for further information about profit figures for 1942 did not in itself warrant a conclusion that renegotiation had begun. Petitioner states that it was incumbent on respondent to give some fair, unequivocal and unmistakable notice of its intention to commence renegotiation, citing *Sessions & Son* v. *Secretary of War*, 6 T. C. 1236, and concludes such notice was never given it before the close of 1943.

It is well settled that a contractor or subcontractor must receive clear notification of a Secretary's intent to commence renegotiation before it can be held that such proceedings commenced within the

---

[1] SEC. 403 (c) (6). No renegotiation of the contract price pursuant to any provision therefor, or otherwise, shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs.

meaning of section 403 (c) (6). Such notification may well be in the form of an oral or written notice by the Secretary stating that renegotiation is commencing. The evidence in this proceeding falls short of proving that in any of its communications with petitioner in 1943 respondent ever gave petitioner such an express warning. But such notification to a contractor may also arise indirectly from the nature of the actions taken by the Secretary. Thus we said in the *Sessions* case, page 1244: "It [renegotiation] could not commence until the Secretary had done something to indicate to a reasonably intelligent contractor that it was to commence at that point."

A review of the communications between petitioner and the renegotiating authorities leading up to the conference of December 14, 1943, as well as the discussions at that conference, can lead only to the conclusion that on that date it should have been unmistakably clear to an intelligent contractor that renegotiation had commenced. Major Dilks' letter of October 25, 1943, requesting data concerning petitioner's renegotiable business in 1942, stated that the purpose of this information was to permit a determination of whether or not further action need be taken in regard to renegotiation. Such further action was taken. On November 24, 1943, Major Dilks mailed to petitioner a letter stating that on the basis of information submitted further consideration of the renegotiation of its contracts was being assigned to respondent. On December 10, 1943, petitioner was requested by phone to come to respondent's offices to further break down figures it had previously submitted. Burnham's memorandum of that conference states that renegotiation of petitioner's war contracts in 1942 was discussed. In support of this conclusion the memorandum sets out details of petitioner's financial history up to and including 1942 which were disclosed by its representatives. It also notes that petitioner agreed to submit further specific data regarding its renegotiable business in 1942 requested by respondent. We have no reason from the evidence to doubt the veracity of this memorandum. Moreover, Levine admits that he realized at the time of the conference that the information requested was in connection with renegotiation of petitioner's war contracts. To paraphrase the language of this Court in *Spray Cotton Mills* v. *Secretary of War*, 9 T. C. 824, we are convinced that this conference constituted unmistakable notice from respondent of its decision to renegotiate and a demand upon petitioner for the specific information upon the basis of which a determination of excessive profits could be made. Thereby petitioner was brought in as a party to a proceeding which would lead to a determination respecting excessive profits. The conference between petitioner and respondent plainly indicated that the machinery of renegotiation was in motion. We thus found as a fact and now

hold that respondent commenced renegotiation before December 31, 1943.

In the event we found that renegotiation commenced before the end of 1943 under the authority of the *Spray Cotton Mills* case, petitioner then argues that Congress intended entirely different standards for determining the start of renegotiation than were set forth in that case. We can find no authority for the standards petitioner suggests either in the statute or the court decisions interpreting it, and therefore we reject this alternative contention.

We now come to the question whether the net profits realized by petitioner from its renegotiable business in 1942 were excessive and, if so, to what extent. But before we can consider this question, we must deal with two preliminary questions determinative of the amount of net profits petitioner realized from renegotiable business in that year. The first preliminary question we must decide is whether $68,415.60 of petitioner's total sales of $345,127.37 in 1942, constituting part payment received on five war contracts not completed until 1943, is includible in petitioner's renegotiable sales for 1942. Petitioner contends that since these five contracts were not completed until the following fiscal year, receipts arising therefrom were not part of its renegotiable business for 1942. The basis for this argument lies in petitioner's interpretation of the last sentence of section 403 (c) (6) of the Renegotiation Act of 1942, requiring a Secretary to commence renegotiation of war contracts within one year after the close of the fiscal year of the contractor within which the contracts were completed. It interprets this language to mean that renegotiation of contracts in any fiscal year may not include receipts received from contracts which are not completed until the following fiscal year. In support of this contention petitioner quotes sentences taken from our decisions in *Sessions & Son, supra,* and *Louis H. Abramson,* 11 T. C. 122, interpreting section 403 (c) (6). It also cites *Stein Brothers Manufacturing Co.* v. *Secretary of War,* 7 T. C. 863, and *Bibb Manufacturing Co.* v. *Secretary of War,* 12 T. C. 665, for the proposition that war contracts are not divisible between fiscal years for renegotiation purposes.

Petitioner's contention so obviously results from a misinterpretation of section 403 (c) (6) and the cases it cites that no extended discussion is necessary in rejecting that proposition. In the *Sessions* and *Abramson* cases, we merely pointed out that in renegotiating war contracts of a contractor for any given fiscal year, renegotiation of such of those contracts as were completed in that year must commence within a year thereafter. We emphatically did not say that renegotiation could encompass only those contracts completed in the fiscal year under consideration. That the opposite is true is borne out by two quotations from the *Sessions* case itself. At page 1239 we said:

"The gross receipts for the accounting year might include receipts on contracts which were not fully completed within that year. The receipts from such contracts for the subsequent year would be considered in the renegotiation of that later year. The law does not limit renegotiation to completed contracts * * *." On page 1240, we said: "But [section 403 (c)] (6) can serve to cut off renegotiation *only* on contracts completed or terminated within that period * * *." (Emphasis added.) In both the *Sessions* and *Spray Cotton Mills* cases we determined the amount of excessive profits received in 1942 from contracts which were not completed until 1943.

As to the divisibility of petitioner's five war contracts, we note that petitioner's income tax return for 1942 included the $68,415.60 received on these contracts in that year in gross receipts, so that petitioner clearly did not deal with them on a completed contract basis. Furthermore neither the *Stein* nor *Bibb Mfg. Co.* cases holds that war contracts may not be divided between fiscal years for renegotiation purposes. Our holdings in those two cases are limited to their special facts which brought them within the language of section 403 (c) (6) of the Renegotiation Act of 1942, expressly excluding from renegotiation contracts on which final payment was made before April 28, 1942. In those cases payments were made on war contracts both prior and subsequent to April 28, 1942. Due to the statutory provision, we held in both cases that the entire receipts, not merely those received on and after April 28, 1942, were subject to renegotiation. Our holdings in these two cases as to the non-divisibility of contracts before and after April 28, 1942, afford petitioner no support in the instant case. We therefore found as a fact and now hold that the $68,415.60 is includible in petitioner's renegotiable business for 1942.

The second preliminary question we must determine is what constituted reasonable compensation for petitioner's two officers, William Wilson and Donald Wilson, in 1942. While section 403 (c) (3) of the Renegotiation Act of 1942 authorizes an allowance for salaries paid by a contractor to its officers in determining excessive profits, section 403 (d) makes it clear that no allowance shall be made for salaries in excess of a reasonable amount. It is petitioner's contention that the $63,000 paid to William Wilson and the $42,000 paid to Donald Wilson in 1942 were reasonable salaries and should be allowed in full. Respondent, however, argues that officers' salaries totaling $105,000 constitutes a distribution of profits and that a reasonable compensation for both men should not exceed $24,000.

It is well settled that what is reasonable compensation is essentially a fact question to be resolved in the light of the special facts of each case. *Miller Mfg. Co.* v. *Commissioner*, 149 Fed. (2d) 421. Other cases involving this question are of little aid as precedents. *Wood Roadmixer Co.*, 8 T. C. 247. Where, as here, the compensation was

contingent in nature, all circumstances must be considered, both those existing at the time the compensation was agreed upon and those present at the time the compensation was paid, and no one factor is determinative. *Hoffman Radio Corp.* v. *Commissioner*, 177 Fed. (2d) 264, and *Mayson Mfg. Co.* v. *Commissioner*, 178 Fed. (2d) 115.

We shall first consider whether the compensation arrangement for the Wilsons voted by petitioner's board of directors on April 6, 1942, was fair and reasonable in view of the conditions existing at that time. It is at once obvious that the resolution passed by petitioner's board of directors was not the result of an arm's length transaction between petitioner and the Wilsons. No interest adverse to the Wilsons represented petitioner at the meeting. The terms of the resolution were the result of an agreement solely between the Wilsons, who between them owned all the stock of this small, closely held family corporation. They constituted petitioner's only two officers and two of the three members of its board of directors at the time the resolution was passed. The third board member present at the meeting was William Wilson's daughter. Thus no one was present at the meeting whose financial interest was opposed to the payment of excessive compensation to the Wilsons. Under such circumstances the contingent compensation arrangement must be closely scrutinized to see whether it is fair and reasonable.

We are convinced that provision in the resolution for the division between petitioner's two officers of 90 per cent of petitioner's net profits for 1942 as compensation for their services was entirely unreasonable and excessive in the light of circumstances on April 6, 1942. At the outset we note that the allocation of a large percentage of company profits to officers' salaries is customary only in personal service companies and not in a fabricating and assembly business, where plant equipment and labor force play such a vital role in the realization of income. Furthermore, it was clearly foreseeable in the fourth month of 1942 that 90 per cent of petitioner's net profits for the year would far exceed anything previously paid its officers. The $30,000 received by the Wilsons in 1941 constituted slightly less than 90 per cent of the company's net profits in 1941 and they could be sure in April 1942 that receipts and net profits would double or triple in petitioner's field due to the vast increase in shipbuilding required by the entry of this nation into war in December 1941. It was equally evident at that time that while such increased business might add somewhat to the duties and working hours of petitioner's officers, yet it would cause no major change in their responsibilities. Moreover it was clear that the expected jump in petitioner's income would be due to the war economy rather than founded on services performed by William and Donald Wilson.

Turning to the provision in the resolution for the allocation of compensation to the two officers on a 60-40 basis, we find this division bears no relationship to the value of their respective services. Allocation of 40 per cent of the total compensation to such a young, inexperienced engineer as Donald Wilson at a time when his services at petitioner's plant were being limited to weekends is completely out of balance with the value of his services.

When we couple all the above circumstances with the fact that the two Wilsons held all of petitioner's stock, that petitioner had never paid a dividend, that compensation was based on petitioner's net profits, that the 60-40 ratio of compensation between William and Donald Wilson roughly approximated the proportion of stock each held, we are led to the inevitable conclusion that the compensation authorized by the resolution of April 6, 1942, represented an attempt by the Wilsons to distribute company profits in the guise of compensation for services.

Consideration of the circumstances existing at the close of 1942 when William and Donald Wilson were paid $63,000 and $42,000 confirms our view that the compensation paid was excessive and constituted in part a distribution of profits. A comparison of these figures with the salaries received in the prior year strikingly illustrates the tremendous boost in their compensation. We have found as a fact, despite the stipulation to the contrary, that petitioner paid William Wilson $18,000 and Donald Wilson $12,000 in 1941. We made this finding in conformity with the schedule furnished Major Dilks by petitioner which shows that $12,000 of the $30,000 compensation paid in 1941 was received by Donald. Thus in the case of William Wilson, his salary was increased over three times in 1942. We recognize his ability and skill, his years of experience, the myriad duties he performed at petitioner's plant and with subcontractors, and the long hours of work he put in during 1941 and think that his services were fully worth the $18,000 he was paid. We further think that William Wilson was entitled to a moderate increase in salary in 1942 due to the extension of his responsibilities caused by the upsurge in the company's business in that year. But the great jump in compensation he received in 1942 was out of all proportion to the value of the services he performed. In valuing his services, we were not sufficiently convinced by petitioner that the Wilson-type watertight door was a patentable article to require us to conjecture what royalties William Wilson gave up by waiving patent rights on the door.

Turning to Donald Wilson, while the evidence does not make clear his services in 1941, we can only assume that they were similar in nature to those performed in 1942. We consider the part-time designing and drafting work of this inexperienced young engineer com-

pletely out of proportion to the $12,000 paid him in 1941, the first year he was on a salary basis. In our view such compensation in large part represented a distribution of profits to him. Therefore the $42,000 paid Donald in 1942 appear grossly excessive, even conceding that his responsibilities increased slightly over those of the past years due to the large influx of war business.

Petitioner raises the point that while William Wilson was experimenting to improve the design of the watertight door during the years 1933–1939, he received a salary far beneath the value of his services. Petitioner also notes that Donald Wilson assisted his father in this development work to an increasing extent over these years and yet never received any compensation for these services. Therefore it argues that the high salaries paid in 1942 were in part to compensate for the inadequate remuneration of the Wilsons in earlier years. The evidence does not support this assertion. The resolution of April 6, 1942, makes absolutely no reference to past services, but rather expressly states that the 60-40 division between the Wilsons of 90 per cent of the net profits constitutes their salaries for 1942. See *Wood Roadmixer Co., supra.* Furthermore, there is no evidence of any obligation, express or implied, on petitioner's part to pay William Wilson further compensation or to pay Donald Wilson any compensation for work performed in past years. It is only logical to imply that as sole stockholders of a company struggling to stay in existence, they were willing to work for practically nothing in order to reap their full reward when the watertight door was fully developed. In fact William Wilson stated that he was willing to accept a low salary during the 1930's because he felt he would be repaid for his financial sacrifices in later years when petitioner was a success. As owners of the corporation it would be only natural that the Wilsons would not expect a salary reflecting the value of their services until petitioner was financially able to pay such amounts. See *Lucilla deV. Whitman,* 12 T. C. 324. We therefore reject this contention by petitioner.

In considering the value of the services of the Wilsons to petitioner in 1942 we are also influenced by the fact that petitioner's operations in that year were relatively simple ones involving primarily machining, welding and assembling parts provided by subcontractors. At least 50 per cent of the operations necessary for petitioner to produce a finished product were carried out by subcontractors. Thus the extent of the work performed by the Wilsons was limited by the nature of petitioner's business.

One of numerous tests in determining reasonableness of an officer's salary is its relationship to the gross receipts and net income of the company employing him. In the instant situation total salaries of $105,000 are out of proportion with petitioner's gross sales of

$345,127.37 and net income of $117,178.77 before salaries in 1942. The evidence fails to reveal circumstances justifying allocation of such a large proportion of profits to officers' salaries. It is also significant that in 1942 when petitioner's salary payments were so high, no dividend was declared.

While both petitioner and respondent introduced expert testimony on the issue of reasonable compensation, we are able to place little reliance on the opinions expressed. The testimony of petitioner's witness that the services of William Wilson were worth $50,000 in 1942 is too full of discrepancies to be of great value. Moreover he admitted that a company whose gross sales were only $345,000 could not afford to pay such a salary. We can assign equally little probative force to the testimony of respondent's witness that the total reasonable compensation for petitioner's officers in 1942 would be $24,000. Respondent's witness was a business analyst, who was never connected with a steel fabricating plant such as petitioner, nor in touch with the customary salaries paid for responsibilities such as William and Donald Wilson undertook in 1942. In reaching our determination we have not had the benefit of evidence showing the prevailing rates of compensation for comparable positions in comparable concerns.

Under all the circumstances enumerated we found as a fact that the compensation paid to both Wilsons was excessive and constituted in part a distribution of profits. On the other hand, we are convinced that respondent's figure of $24,000 is too low to represent reasonable compensation for both men. We found as a fact and now hold that $32,000 constituted reasonable compensation for petitioner's officers.

After allocating such compensation allowance between renegotiable and non-renegotiable business, we now come to the question whether petitioner's net profits of $63,992.12 on its renegotiable business in 1942 were excessive in amount and, if so, to what extent. We have considered all relevant factors, including the character and nature of the business, the nature and extent of contribution to the war effort, business risks assumed, the amount and source of capital employed, net worth, the volume of production, pre-war earnings, and reconversion to peacetime production. There was insufficient evidence to properly judge the efficiency and economy of petitioner's production. Petitioner submitted no expert testimony on this issue. While respondent's expert testified that a reasonable profit would not exceed $36,000 we do not attach much weight to this opinion. Even respondent himself has refused to follow it. It is our conclusion that petitioner realized excessive profits in the amount of $20,000 from its renegotiable business in 1942, and we so hold.

An order will issue in accordance herewith.