WALTHAM SCREW COMPANY, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 918–R. Filed October 27, 1958.

*Edward T. Martin, Esq.*, for the petitioner.

*Beatrice M. Rosenhain, Esq.*, and *Harland F. Leathers, Esq.*, for the respondent.

TIETJENS, *Judge*: The Renegotiation Board determined that Waltham Screw Company had realized excessive profits of $37,951 in 1951 from contracts and subcontracts subject to renegotiation. Waltham Screw Company filed a petition pursuant to the Renegotiation Act of 1951, 65 Stat. 7 (Pub. L. No. 9, 82d Cong., 1st Sess.). By amended answer the Board alleges that the petitioner realized excessive profits in the amount of $50,000. The petitioner contends that it had no excessive profits in 1951. Issues for decision relate to the amount of subcontracts subject to renegotiation, the reasonableness of executive salaries paid in 1951 and the amount, if any, of excessive profits realized. Some facts are stipulated.

FINDINGS OF FACT.

Waltham Screw Company is a corporation organized under the laws of Massachusetts prior to the year 1900. In 1951 it had issued and outstanding 500 shares of capital stock of $100 par value, of which 125 shares were held by each of the following officers:

> Daniel Viles, president.
> Catherine Viles Watts, 1st vice president.
> Lyman Viles, clerk.
> Sheldon Viles, treasurer.

The stockholders constitute the board of directors of the company. Daniel, Lyman, and Sheldon Viles are brothers. Catherine Viles Watts is their sister.

Waltham is engaged in the manufacture of screws and screw machine products.

The petitioner's books and records were maintained upon an accrual basis.

In the year 1951 the petitioner's gross sales were $1,160,412; cost of goods sold was $730,026; gross profit on sales, $430,386; selling and general expenses, $223,237; other expenses, $25,392; and net operating profit, $181,757. The selling and general expenses included $113,757 paid as salaries and bonuses to the officers.

The compensation of the petitioner's officers for the years 1946 to 1950 was:

| | Years ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1946 | 1947 | 1948 | 1949 | 1950 |
| Daniel F. Viles, president | $15,000 | $17,000 | $17,000 | $17,000 | $17,000 |
| Sheldon Viles, treasurer | 15,000 | 17,000 | 17,000 | 17,000 | 17,000 |
| Lyman Viles, clerk | 5,340 | 9,850 | 9,850 | 9,850 | 14,000 |
| Catherine Viles Watts, 1st vice president | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Total | 38,340 | 46,850 | 46,850 | 46,850 | 51,000 |

In November 1950 the board of directors of petitioner voted to increase the salaries of the officers effective for the year 1951.

In December 1951 the petitioner executed a trust agreement establishing a salary bonus plan trust intended as a profit-sharing plan within the intent of section 165 of the Internal Revenue Code of 1939. There were 16 participants in 1951, including the 4 officers. Payments into the plan in 1951 were in the total amount of $22,322.50 which included $13,757 allocated to the 4 officers.

Pursuant to the resolution and the salary bonus plan the executive officers received the following compensation in 1951:

| | Salary | Bonus | Total |
| --- | --- | --- | --- |
| Daniel F. Viles | $35,000 | $4,786 | $39,786 |
| Sheldon Viles | 35,000 | 4,825 | 39,825 |
| Lyman Viles | 25,000 | 3,374 | 28,374 |
| Catherine Viles Watts | 5,000 | 772 | 5,772 |
| Total | 100,000 | 13,757 | 113,757 |

A certificate of necessity was issued to the petitioner in March 1952 covering buildings and machinery totaling $72,596.25. Anticipating this certificate the petitioner made additions to buildings totaling $13,306.85 and additions to machinery totaling $23,983.75 during 1951.

In the years 1946 to 1951 the petitioner made additions of machinery and equipment purchased in the following amounts:

| 1946 | $11,598.58 |
| --- | --- |
| 1947 | 46,671.60 |
| 1948 | 22,247.25 |
| 1949 | 273.00 |
| 1950 | 23,815.75 |
| 1951 | 17,351.46 |
| | 121,957.64 |

In the years 1946 to 1950 the petitioner's net sales, cost of goods sold, and net operating profit or loss were:

| | Years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1946 | 1947 | 1948 | 1949 | 1950 |
| Net sales | $533,663 | $578,826 | $431,309 | $422,269 | $544,734 |
| Cost of goods sold | $385,181 | $412,585 | $342,146 | $365,143 | $404,415 |
| Net operating profit | $35,934 | $40,127 | | | $14,655 |
| Net operating loss | | | $20,491 | $55,724 | |
| Ratio of net operating profit (or loss) to net sales | 6.73% | 6.93% | (4.75%) | (13.20%) | 2.69% |

In the years 1949, 1950, and 1951 the petitioner's dollar sales per employee and average hourly wage rates were:

| Year | Sales per employee | Average hourly wage rate |
|---|---|---|
| 1949 | $5,556 | $1.28 |
| 1950 | 7,565 | 1.46 |
| 1951 | 10,645 | 1.76 |

The petitioner had direct renegotiable sales in 1951 in the amount of $168,461. The petitioner made inquiry of certain of its customers as to the amount of the petitioner's sales to them which were subject to renegotiation. The replies establish that the petitioner had renegotiable sales on subcontracts in the amount of $249,700 from certain of such customers.

The petitioner's civilian products were items which it had made on a repeat order basis over a period of years. The petitioner purchased the material and carried the process through to the finishing of the product. The products made under renegotiable contracts in 1951 were generally not the type on which repeat orders were received and were in many instances new products to the petitioner or required machining of different metals. They involved more complex or intricate manufacture and more secondary operations and the standards of quality were higher and more exacting than in the case of civilian products of the petitioner. Some renegotiable contracts were for fine instrument screws which were not stock items but were new and different products involving stainless steel and other metals new to the petitioner's experience. The renegotiable contracts were awarded upon competitive bidding.

The capital employed in the petitioner's renegotiable business was furnished by it and not by its customers or by the Government. At the beginning of 1951 the book value of the petitioner's fixed assets was $276,954.05.

The renegotiable contracts undertaken by the petitioner did not contain escalator clauses to provide against increases in cost of materials or wages.

The petitioner undertook a renegotiable contract for manufacturing items described as "support plungers" which contract contained a liquidated damages penalty clause. This was a new item to the petitioner which was unable to meet the agreed delivery schedule. The

petitioner subcontracted orders to another firm at a higher price than it was to receive from the Government, but deliveries from the other firm were still delayed and the petitioner paid damage penalties of $16,368 attributable to shipments in 1951.

The petitioner undertook to manufacture an item identified as a "primer, percussion M54," usually referred to as an "anvil." The first such contract was undertaken in April 1950. The petitioner devised a method of manufacture which enabled production of anvils in one operation instead of two. It produced and shipped 10,213,320 anvils in 1951 for which it billed the Government $103,267.78.

A report compiled by the National Screw Machine Products Association relative to the 1951 operations of the Screw machine products industry shows that member companies having annual sales of over $600,000 realized an average profit before tax of 12.8 per cent and after tax of 5.1 per cent, with the highest having a profit of 18.8 per cent before tax and 11.8 per cent after tax and the lowest having a profit of 4.5 per cent before and 1.9 per cent after tax.

The balance sheets of the petitioner as of the end of the year for 1947 to 1951 show:

|  | 1947 | 1948 | 1949 | 1950 | 1951 |
|---|---|---|---|---|---|
| Current assets | $106,607 | $101,083 | $110,742 | $117,231 | $309,507 |
| Net fixed assets | 146,050 | 146,211 | 123,024 | 126,975 | 148,755 |
| Total assets | 259,304 | 254,027 | 240,471 | 252,148 | 476,059 |
| Current liabilities | 65,794 | 81,950 | 98,935 | 89,930 | 246,462 |
| Long-term debt | | | | 8,000 | 12,000 |
| Net worth | 193,510 | 172,078 | 141,536 | 154,218 | 217,597 |

The petitioner's sales, profits (or losses) after executive compensation, and the amount of executive compensation paid for each of the years 1946 through 1951 were:

| Year | Sales | Profit (or loss) after executive compensation | Executive compensation |
|---|---|---|---|
| 1946 | $533,633 | $35,934 | $38,340 |
| 1947 | 578,826 | 40,127 | 46,850 |
| 1948 | 431,309 | (20,491) | 46,850 |
| 1949 | 422,269 | (55,724) | 46,850 |
| 1950 | 544,734 | 14,655 | 51,000 |
| 1951 | 1,160,412 | 181,757 | 113,757 |

The petitioner had certain machinery which was fully depreciated on its books but was useful in manufacturing products needed in the defense effort.

The petitioner had renegotiable sales from contracts and subcontracts in 1951 in the amount of $426,795.

Reasonable compensation for the services of the officers of the petitioner in 1951 was not in excess of $78,757.

The petitioner realized excessive profits from contracts and subcontracts in 1951 in the amount of $20,000.

The stipulated facts are incorporated by reference.

OPINION.

The Board contends that renegotiable sales were $555,410 out of $1,160,412 total sales; profit on such sales was $141,470 before executive compensation out of $295,510 of total profit, reasonable executive compensation was not more than $78,757, and excessive profits on renegotiable sales was $50,000. The petitioner's position is that renegotiable sales did not exceed $426,795, that executive compensation of $113,757 was reasonable, that profit on renegotiable sales after executive compensation was $72,337 out of total profit of $190,960.40, and that none of such profit was excessive.

The amount of renegotiable sales in 1951 is in dispute. The petition alleged renegotiable sales of $426,795. The answer admits that—

petitioner received or accrued under contracts or subcontracts subject to renegotiation not less than $456,475 and derived a profit therefrom of not less than $72,337, and for lack of knowledge or information sufficient to form a belief, denies that the said amounts were the total sales or profits received or accrued by petitioner for the period here involved which were subject to renegotiation, * * *

The amended answer alleges that petitioner received or accrued under contracts or subcontracts subject to renegotiation the amount of $555,410 on which it derived profits of $112,930 before taxes. The total sales were $1,160,411.56. It is agreed that the amount of the direct renegotiable sales is $168,461, and it is also agreed that sales on subcontracts in the amount of $249,700 also are renegotiable sales, making a total of $418,161. The Board contends that additional sales on subcontracts amounting to $140,344 also are renegotiable. The parties stipulated:

2. An analysis has been made (by the respondent) of the sales invoices and purchase orders contained in petitioner's books and records which reflects sales invoices and purchase orders totalling $140,344. bearing contract numbers indicating subcontracts under contracts with governmental agencies named in the Renegotiation Act of 1951 as amended, in addition to the figure of $249,700. shown in paragraph 1 above.

The Board introduced no such analysis or other evidence of these additional subcontracts. The petitioner did not agree that the analysis was correct, and says that it was prepared to present evidence from its customers to refute the accuracy of the analysis. It argues that since this increase in the amount of renegotiable subcontracts was first alleged in the amended answer, whereby an increase in the amount of excessive profits was claimed, the burden is upon the Board, under

Rule 32 of this Court, to produce evidence to show that the additional subcontracts were renegotiable.

The Renegotiation Act of 1951 provides that a "proceeding before the Tax Court to finally determine the amount, if any, of excessive profits shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo." Rule 64 of this Court makes applicable in renegotiation cases the other rules of the Court. Under Rule 32 the burden of proof is upon the petitioner, except that in respect of any new matter pleaded in the answer it shall be upon the respondent. The Board has the burden of proving the claim raised in the amended answer for an increase in the excessive profits over the amount placed at issue by the petition. *Nathan Cohen* v. *Secretary of War*, 7 T. C. 1002, 1011.

The Board's own regulations [1] recognize the difficulty of ascertaining

[1] Renegotiation Board Regulations (under the Renegotiation Act of 1951).

1456.3 How to determine receipts or accruals subject to renegotiation; generally.— (a) The contractor shall first determine the total receipts or accruals during its fiscal year, on and after the dates specified, from its prime contracts with the Departments listed in section 1452.2 of this subchapter, other than those exempted pursuant to section 106 (a) and (d) of the act (see Parts 1453 and 1455 of this subchapter). Prime contracts with the Departments may be readily identified by reference to the prime contracts themselves.

(b) The contractor shall then determine the total receipts or accruals during the applicable period from its subcontracts. The following methods will be acceptable to the Board for identifying subcontracts which are renegotiable:

(1) In many cases the subcontractor will be able to obtain sufficient information for purposes of renegotiation if it inquires from its customers regarding the use to which supplies or services furnished by such subcontractor have been put, or, in the case of machinery or equipment, the use to which the articles produced thereby have been put. This information may show that the customer has employed the articles delivered to it in producing other articles of which a specified percentage has been delivered to fulfill orders from Departments. The percentage may be stated in terms of dollars, units, or merely percentage. * * *

(2) In certain cases, when the subcontractor has numerous customers in the same industry for a single product, and it would be reasonable to assume that the proportion of renegotiable sales to a representative sample of such customers will conform roughly to the proportion of renegotiable sales to such customers as a group, the subcontractor may make a sampling of such customers in order to determine the extent of the renegotiable sales. In certain cases, when the subcontractor has numerous customers in the same industry for a single product, and it would be reasonable to assume that the proportion of renegotiable business to total business of these customers as a group will conform roughly to the proportion of the industry as a whole, the subcontractor may use governmental, trade association or other reports indicating the proportion of renegotiable business to total business in the industry as a whole.

(3) In certain cases, the subcontractor may find it more suitable to identify the renegotiable subcontracts one by one. The first indication that a subcontract is renegotiable is, of course, that it contains a renegotiation clause or a notation stating that it is subject to renegotiation. However, the absence of a clause or statement cannot be relied on as indicating that the subcontract is non-renegotiable; and the clause or notation is in some cases erroneously added, or the subcontract is exempted only after it is made. Some prime contractors make a practice of including a renegotiation clause in all subcontracts, even those manifestly not subject to the act. A renegotiable subcontract may be identified if it contains a reference to a Government contract number and if the number indicates that the subcontract relates to a prime contract with one of the Departments listed in section 1452.2 of this subchapter. Similarly, the subcontract may contain a reference to a CMP allotment number or a DO rating which can be identified from the symbols used as having been issued by any of the Departments listed in section 1452.2 of this subchapter.

(4) The subcontractor may wish to adopt some method of obtaining information or making estimates of the probable end use of components supplied by it which, although not

accurately the amount of renegotiable receipts from subcontracts. These regulations recognize that a contract number indicating a contract with a Government agency is not proof that the contract is renegotiable. Sec. 1456.3 (b) (3).

There are some types of contracts not subject to renegotiation such as purchases for stock or contracts in which the aggregate amount involved does not exceed $1,000 and the period of performance will not be in excess of 30 days. See Regulations of the Board, secs. 1455.6 (b) and 1455.3 (b) (5). In determining the extent of its renegotiable subcontracts the petitioner had to rely on what its customers reported to it. It had inquired of its customers and from the answers received ascertained that its renegotiable sales amounted to $426,795. Apparently the Board's determination was based upon this figure to which it had agreed. After the petition was filed the Board sought to increase the amount of excessive profits based upon the addition of other contracts found in its analysis of the petitioner's records.

Since the Board did not put in evidence its analysis or otherwise show the subcontracts involved, the petitioner is not obliged to prove that all its other sales on subcontracts were not subject to renegotiation. As an example of the difficulty of determining whether subcontract sales are renegotiable the petitioner describes orders from United States Gauge Company in the amount of $3,857.60 which the Board had classified as renegotiable because the orders bore contract numbers, but which the purchaser advised the petitioner were not subject to renegotiation. The petition alleges that renegotiable sales amounted to $426,795. The stipulation agrees upon $418,161. The burden is upon the Board to prove renegotiable sales in excess of the amount stated in the petition, and it has not met this burden. See *Eastern Machinery Co.* v. *Under Secretary of War*, 12 T. C. 71.

Next, the parties disagree over the reasonableness of the compensation paid the four stockholder-executives in the taxable year. In 1947, 1948, and 1949 the petitioner paid annually as salaries $17,000 each to Daniel and Sheldon Viles, $9,850 to Lyman Viles, and $3,000 to Catherine Viles Watts, a total of $46,850. A total of $51,000 was paid in 1950 when the salary of Lyman Viles was increased to $14,000. In November 1950 the Vileses, as the board of directors, fixed their salaries for 1951 as officers at $35,000 each for Daniel and Sheldon, $25,000 for Lyman, and $5,000 for Catherine Watts. In 1951 these officers also received bonuses through the profit-sharing plan. Their total compensation amounted to $113,757. The Board considers this excessive and contends that as a cost against renegotiable sales an allocable part of not more than $78,757 should be allowed.

---

included in any of the methods in subparagraphs (1) to (3) of this paragraph, will enable a segregation to be made sufficiently accurate for the purposes of renegotiation. The Board will not disapprove any method if it is satisfied that such method, under all the circumstances, affords the best basis for reasonably precise determination.

The petitioner contends that the executive compensation was reasonable, that it was justified by the qualifications of the officers, the increased duties involved in handling more complex renegotiable business, and an increased volume of civilian business, and points out that the amount was not questioned upon audit of the tax return by the Internal Revenue Service and the salaries were voted prior to the beginning of the fiscal year involved. The petition alleges that in the years immediately prior to 1951 it was investing considerable sums in improving its machinery and that the officers accepted lower salaries in those years to enable the company to do this.

The members of the family were the sole stockholders, the directors, and the executive officers. They fixed their own salaries by mutual agreement. At the time of the formal action there was an increasing volume of business from which an increase in profits would reasonably be expected. The corporation had paid no dividends for several years. Catherine had lived in Seattle since 1946, spent only a few days in each year with the business, attending stockholders' or directors' meetings. Daniel, Sheldon, and Lyman devoted their full time to the petitioner's business. With an increase of business volume in sight, no doubt they had some increased responsibilities and some increase in salaries was justified, but the evidence presented does not warrant doubling the executive compensation. We have considered the evidence and find that for purposes of renegotiation only an allocable part of $78,757 is allowable as a cost against renegotiable sales. *Eastern Machinery Co., supra; Conn. Marine Boiler Works*, v. *Sec'y Maritime Comm.*, 16 T.C. 339; *Quartz Laboratories, Inc.* v. *Secretary of War*, 11 T. C. 626.

The Renegotiation Act of 1951, in section 103 (e),[2] specifies certain factors to be considered in determining what portion of the profits derived from Government contracts and subcontracts is excessive.

---

[2] SEC. 103. DEFINITIONS.
For the purposes of this title—

\* \* \* \* \* \*

(e) EXCESSIVE PROFITS.—The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

The petitioner contends that consideration of these factors shows that its profits from renegotiable business were not excessive.

The petitioner's civilian products included such items as fine instrument screws, a switch mechanism for a home vaporizer, parts for food mixers, spikes for athletic shoes, brush holders for vacuum cleaners, ballpoint pen connectors, and parts for washing machines, while its military products were new items such as rotors, support plungers for fuses, oxygen breakoff nipples, jet engine components, and anvils. Its civilian products were routine items produced over a long period of years on a repeat order basis while the military items in general involved different metals, new engineering and tooling problems, greater diversification, and meeting higher quality standards which should warrant a higher profit return. The military items required secondary operations which increased the cost of producing them in more instances than did the civilian products. The petitioner furnished all materials and financing of the military products.

In determining the amount of the profits deemed excessive, the Board points out that the petitioner's capital was invested in a business which averaged no profit in the years 1946 through 1949 beyond the amounts taken out as executive compensation by the family which owned and managed it, that this amount of compensation averaged $44,683 per year for those years and was approximately 26 per cent of the average net worth of the company as of January 1 of such years, which average was $167,522. The net worth at the beginning of 1951 was $154,218. Profits in 1951 before withdrawal of executive compensation were $295,514. The Board argues that after elimination of $50,000 of this as excessive the petitioner still has a profit of 159 per cent of its net worth at the beginning of the year.

The Board contends that the application of the statutory factors indicates that the petitioner is not entitled to unusual consideration for its contribution to the war effort, that it failed to meet delivery schedules and satisfactory production rates on its renegotiable business, that the Boston Ordnance District therefore stopped soliciting bids from petitioner on Army contracts, that its rejection rate was high, its rate of production per employee below average, that it was not economical in the use of materials, that it increased the prices bid on the item described as the "anvil" from 0.00991 in 1950 to 0.515 in 1952 and 0.674 later, that it was not efficient, that its increase in sales volume resulted from the defense effort and not from the petitioner's efforts, and that its renegotiable products were of the same type as its normal commercial business and were made upon the same machines and with the same technics. The Board says also that the petitioner had assistance from the Government in the way of priorities for material and a certificate of necessity for buildings and machinery.

The petitioner answers that some of these allegations are untrue and the conclusions are unwarranted. While one witness said the Boston Ordnance District stopped soliciting bids from the petitioner on Army contracts, the record shows that further contracts were entered into between that office and the petitioner. The fact that the price was increased on the anvil in contracts after 1951 is not to the petitioner's detriment. There were increased labor costs to consider and the original contract price of approximately 1 cent per unit when compared with the later prices of more than 50 cents would indicate that the petitioner made no profit on the first contract which was in effect in 1951. The higher price in 1952 was negotiated upon bids in response to public advertising and must have been reasonable to the contracting authority or the contract would have gone to other manufacturers. Examination of samples of the products made for civilian use and those for military use shows differences in the types. There was testimony that the military products involved secondary operations in more cases than did civilian products.

The record discloses no accurate basis for determining the relative costs of civilian and military products. The Board contends that the military items were similar to or possibly simpler than the civilian. The petitioner argues that the military items were the more difficult and this seems to be borne out by the evidence, but still we are unable to ascertain accurately what profits were made on the renegotiable business. The parties have agreed that costs may be allocated in the proportions of renegotiable and civilian sales.

The certificate of necessity issued to the petitioner in 1952 was after the year involved here and did not provide Government assistance in 1951 or affect the earnings of that year but merely authorized a faster writeoff of depreciation in subsequent years. Priorities did not furnish capital to buy materials but merely insured that metals were not diverted to less essential civilian uses. The petitioner made use of some equipment which was fully depreciated and not shown on its balance sheet and should be entitled to some earnings on these machines for having them available when urgently needed for national defense purposes. This fact tended to reduce the cost of the renegotiable products and the petitioner is entitled to share in such saving. *Albert & J. M. Anderson Mfg. Co.* v. *Sec. of War*, 12 T. C. 132, 140.

In making the item described as an anvil, the petitioner devised a method of manufacture which eliminated a secondary operation and made it possible to produce the item in shorter time and at less cost. This was a contribution to the defense effort of significance as Waltham shipped over 10 million of these in 1951 and received further contracts for them in later years.

This petitioner was not dependent upon financing or material supplied by the Government. It is therefore entitled to more favorable

consideration than a contractor which has assistance of the Government in supplying material or capital for its defense functions. Also the fully depreciated machinery used in defense production was a factor helpful to the defense effort which did not appear in the book figures as part of the capital or net worth. The petitioner says also that its long-range plan to modernize its plant by putting earnings into new machinery which left little profit in prior years should not be penalized by taking away the profits when they are finally achieved in 1951 as a result of this long-range plan. This investment was intended to permit it to enter the field of high-speed, high-volume operations on multispindle machines with a view to realizing greater profits.

The petitioner explains that undertaking to make a new item involves a number of problems, such as setting up the machines, planning inspection methods and standards, and giving employees experience in making the article on the machines. The petitioner says it lost money on the support plunger job. It says the total billings on this contract in 1951 were only $23,713.70 and it paid a liquidated damages penalty of $16,368 and paid another manufacturer more for some of these articles than it would receive under its contract, in an effort to meet the delivery schedule.

We have considered the factors prescribed in the statute bearing upon the reasonableness of profits including comparison of the products, normal earnings, contribution to the defense effort, complexity of manufacturing, and the source and amount of capital involved, and have found that the petitioner's profits were excessive in the amount of $20,000.

*An order will issue in accordance herewith.*