HARRY EDELL AND LEWIS H. EDELL, A COPARTNERSHIP, DOING BUSINESS AS HARRY EDELL, PETITIONER, *v.* UNITED STATES OF AMERICA, RESPONDENT.

Docket No. 882–R. Filed June 10, 1957.

*William J. Casey, Esq.*, and *Edward J. Brady, Esq.*, for the petitioner.

*Harland F. Leathers, Esq.*, and *James H. Prentice, Esq.*, for the respondent.

602

604

610

612

616

OPINION.

HARRON, *Judge:* The first issue presents the problem whether any of the Edell partnership's earnings for each of the 3 years, 1943–1945, inclusive, is subject to renegotiation under the provisions of section 403 (a) (5) (B) of the Renegotiation Act of 1942, as amended.[2] If

---

[2] SEC. 403 (a). For the purpose of this section—

\* \* \* \* \* \* \*

(5) The term "subcontract" means—

(A) Any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of any other contract or subcontract, but such term does not include any purchase order or agreement to furnish office supplies; or

(B) Any contract or arrangement other than a contract or arrangement between two contracting parties, one of which parties is found by the Board to be a bona fide executive officer, partner, or full-time employee of the other contracting party, (i) any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (ii) under which any part of the services performed or to be performed consists of the soliciting,

that issue is decided in the affirmative, another question must be decided, the amount in each year of the partnership's excessive profits, if any, under the provisions of section 403 (a) (4) (A). It is now well established that in a Tax Court proceeding for the redetermination of excessive profits the petitioner has the burden of proving that the respondent's determination is erroneous "with respect to any amount up to that originally determined as excessive, and that the respondent has the burden in respect to any additional amounts proposed for the first time in his answer." *Nathan Cohen* v. *Secretary of War*, 7 T. C. 1002, 1011; *Bass* v. *Stimson*, 20 T. C. 428, 434. The questions to be decided under the first issue, relating to the contracts or arrangements made by the petitioner with various corporations, involve the provisions of section 403 (a) (5) (B). The petitioner has the burden of proving that the respondent erred in its determination that section 403 (a) (5) (B) applies to all such contracts or arrangements. Under the second issue, the respondent has the burden of proof in respect to an additional amount for 1943 which it claimed for the first time at the trial constituted excessive profits, namely, $10,265.[3] Otherwise, the petitioner has the burden of proving that the respondent's original determination of the amount of excessive profits for 1943, $25,735, is incorrect, and that the respondent's determinations of amounts of excessive profits for 1944 and 1945 are erroneous. It is noted, further, that if the second issue is reached, the question must relate to each of the years 1943–1945, inclusive, separately, rather than to the 3-year period taken as a whole.

Under subsection (c) (1) of section 403 of the Renegotiation Act of 1942, as amended,[4] it is provided, in part, unless there is request by a contractor or subcontractor to the proper renegotiation authority (the

attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts : Provided, That nothing in this sentence shall be construed (1) to affect in any way the validity or construction of provisions in any contract with a Department or any subcontract, heretofore at any time or hereafter made, prohibiting the payment of contingent fees or commissions ; or (2) to restrict in any way the authority of the Secretary or the Board to determine the nature or amount of selling expenses under subcontracts as defined in this subparagraph, as a proper element of the contract price or as a reimbursable item of cost, under a contract with a Department or a subcontract.

[3] The respondent's original determination was that petitioner realized excessive profits for 1943, 1944, and 1945, in the amounts of $25,735, $85,541, and $170,377, respectively. Respondent, at the trial, made the claim that excessive profits were realized for 1943 in the amount of $36,000. Under a stipulation, respondent has receded somewhat from its original determination in respect to 1944 and 1945 in that it now claims that in those years profits were excessive in the amounts of $84,000 and $120,000.

[4] (c) (1) * * * The Board shall exercise its powers with respect to the aggregate of the amounts received or accrued during the fiscal year (or such other period as may be fixed by mutual agreement) by a contractor or subcontractor under contracts with the Departments and subcontracts, and not separately with respect to amounts received or accrued under separate contracts with the Departments or subcontracts, except that the Board may exercise such powers separately with respect to' amounts received or accrued by the contractor or subcontractor under any one or more separate contracts with the Departments or subcontracts at the request of the contractor or subcontractor. * * *

War Contracts Price Adjustment Board, in this case) the power to renegotiate shall be exercised "with respect to the aggregate of the amounts received or accrued during the fiscal year * * * by a contractor or subcontractor under contracts with the Departments and subcontracts." Section 403 (a) (8) defines fiscal year to mean the taxable year of the contractor or subcontractor under chapter 1 of the Internal Revenue Code. Petitioner's fiscal year, for purposes of the Renegotiation Act of 1942, as amended, is a calendar year. Petitioner did not request the Board to exercise its powers separately with respect to amounts received under any one or more separate contracts so as, for example, to determine whether excessive profits were realized during the 3-year period, 1943–1945, inclusive. The Board exercised its powers with respect to the aggregate amounts received by petitioner in each of the years 1943–1945, inclusive, and issued three separate orders, one for each year. This Court must, therefore, in this case, consider the question of whether petitioner realized any excessive profits on the basis of the aggregate amounts received by petitioner in each of the years 1943, 1944, and 1945. Sec. 403 (e) (1).[5]

*Issue 1.* This issue presents a question of fact as to whether Harry Edell solicited or procured Government contracts or subcontracts for each of eight corporations from which the Edell partnership received commissions during the years 1943–1945, inclusive. Respondent determined that the partnership's profits during each of those years are subject to renegotiation, and its argument in support of its determination is that the arrangements with each of the eight corporations, from which the partnership's profits were derived, constituted "subcontracts" as defined in section 403 (a) (5) (B). Petitioner contends that none of the eight arrangements constituted "subcontracts" as so defined, and its principal argument in support of this contention is that it did not solicit or procure Government contracts or subcontracts for any of the eight corporations.

In *George M. Wolff et al.* v. *Macauley*, 8 T. C. 146, and in *Leon Fine*, 9 T. C. 600, we held that the petitioners were not subcontractors merely because their compensation was based or computed upon the amount of Government contracts or subcontracts received by their principals, since the petitioners did not solicit or procure any of such Government contracts or subcontracts. In the *Wolff* case, we said (p. 152):

the language of the statute aptly applies to manufacturers' agents and sales engineers who procure Government contracts for their principals and whose compensation is contingent upon the business they are able to obtain for the principals or fixed by the amount of such business.

---

[5] (e) (1) Any contactor or subcontractor aggrieved by an order of the Board determining the amount of excessive profits received or accrued by such contractor or subcontractor may, within ninety days * * * after the mailing of the notice of such order under subsection (c), (1), file a petition with The Tax Court of the United States for a redetermination thereof. * * *

We quoted this language in the *Fine* case, at page 608. In the instant case, petitioner was paid fixed percentages, varying from 2½ per cent to 5 per cent of the amounts paid by the Government to each of its principals under Government contracts. The *Wolff* and *Fine* cases make it clear that this is not, in itself, enough to make the arrangements subcontracts under section 403 (a) (5) (B). It is necessary, also, that the petitioner should have solicited or procured the Government contracts received by its principals.

Petitioner argues that the services performed by the partnership are sufficiently similar to the services performed by the petitioners in the *Wolff* case and the petitioner in the *Fine* case, to require the same conclusion as we reached in those cases, namely, that the petitioner did not solicit or procure Government contracts, and that, therefore, it was not a subcontractor whose profits are subject to renegotiation.

In *French* v. *War Contracts Price Adjustment Board*, 13 T. C. 276, we concluded that the services performed by French constituted soliciting or procuring Government contracts, and we therefore held that he was a subcontractor whose profits are subject to renegotiation. Respondent argues that the services performed by the petitioner are sufficiently similar to those performed by French (in the *French* case) to require the same conclusion.

The facts have been set forth at length in our Findings of Fact. Nevertheless, we believe a brief summary of the facts will be useful.

Petitioner had eight clients during the 3 years 1943–1945. It had one contract, or arrangement, with each of its clients. The parties have stipulated that the services performed by the petitioner for each of its eight clients and that the terms of the arrangement it had with each one were substantially the same. The evidence is general and fragmentary; it does not show in detail as to each of the eight corporations the precise services which were performed by petitioner. However, under the stipulation of the parties, if it is established that petitioner solicited or procured a Government contract for one of the eight corporations, it follows that we may find and conclude that it solicited or procured a Government contract for each of the eight corporations.

The burden of proof is upon petitioner and if it has failed to show what it did for each of its eight clients, there is failure of proof.

The record includes letter memoranda of four of the eight agreements which the petitioner had with its clients. If the question were to be decided solely upon the basis of these letter memoranda of agreement, there would be considerable strength in petitioner's contentions. The agreements which were entered into by Edell on behalf of the petitioner provided that Edell's duties would include carrying on various kinds of research, making analyses, obtaining

information, and serving in an advisory capacity. The draftsman did not, in every instance, include a reference to Edell's obtaining Government contracts. But the question in this case turns upon whether, in fact, each contract, or arrangement, of petitioner with a principal embodied an agreement that Edell would solicit, attempt to procure, or procure a contract, or contracts, with the Government for a principal. Such agreements may have been oral. Section 403 (a) (5) (B) is not limited to written contracts or arrangements.

Decision of the issue in this case cannot be made to depend solely upon the terms of the few examples of letter memoranda agreements between petitioner and some of the corporations which have been placed in evidence by the petitioner. If the issue were to be so limited, it would become an easy matter to avoid the intent of the Renegotiation Act by the simple device of writing agreements which contain no specific provision coming within section 403 (a) (5) (B). Congress did not intend to permit renegotiation to be so easily escaped. Section 403 (a) (5) (B) (ii) is applicable to services "performed" as well as to services "to be performed." The question here is whether, in fact, Edell agreed to solicit and procure Government contracts for each of the eight corporations.

From the entire record, it must be concluded that Edell agreed and was expected to solicit and procure Government contracts. Before contracting with Edell, each of the eight companies desired to obtain Government contracts, but executives of the companies did not know how to proceed to obtain them. This is shown both by the testimony of those executives of companies who were called as witnesses by petitioner, and by the testimony of Edell. The inference is unavoidable that the main reason for the companies' engaging Edell was that they expected him to obtain Government contracts for them. Furthermore, respondent introduced in evidence a file of copies of correspondence between Edell and the various clients of petitioner (Exhibit B) which comprises 290 letters. All of this correspondence has been carefully examined and examples thereof have been included in the Findings of Fact. These quotations from the correspondence involve each one of the eight clients which are involved. They are fairly typical of much that is covered by the correspondence. The quoted letters show clearly that Edell solicited and procured Government contracts for petitioner's clients. Another example is as follows: Edell learned from the Government authorities at Wright Field that a contract for the manufacture of the "Knutson Vest" had been awarded to the Breslee Manufacturing Co. On September 20, 1944, he wrote to Breslee soliciting a subcontract for Colonial to produce a component part of the Knutson Vest, a giant jackknife, and subsequently a subcontract was awarded by Breslee to Colonial Knife for production of the Jiant Jack Knife.

As has been set forth in the Findings of Fact, the evidence shows clearly that Harry Edell, the principal member of the partnership, was authorized to and did represent each of the partnership's eight clients in dealings with various Government agencies, and that he performed the following services: Finding out and advising each of the eight companies about opportunities for Government contracts so as to insure issuance to each of the companies of invitations to bid on Government contracts; assisting each of the companies to prepare and submit bids on Government contracts; negotiating the terms of Government contracts for each of the companies; and contacting Government procurement offices so as to stimulate their interest in the products of each of the companies. These are substantially the same services which were performed by the petitioner in *French* v. *War Contracts Price Adjustment Board, supra*, where we held that the petitioner was a subcontractor. Upon the whole record, our conclusion is that petitioner solicited and procured Government contracts or subcontracts for each of the eight corporations. The partnership undoubtedly rendered other services which were of value both to the Government and to its principals in servicing Government contracts after they were awarded to the principals, but since petitioner also solicited and procured these Government contracts for its principals, and since it agreed to do so, the contracts, or arrangements, under which it performed the services of soliciting and procuring Government contracts were subcontracts within the meaning of section 403 (a) (5) (B) (ii).

Petitioner argues, in effect, that in order for it to be a subcontractor within the meaning of section 403 (a) (5) (B), as that section has been construed in *George M. Wolff et al.* v. *Macauley, supra*, and *Leon Fine, supra*, it is necessary that it should have procured *all of the Government business* out of which it was paid a percentage. Petitioner errs in this contention. In order to constitute each of the eight arrangements as subcontracts, it is necessary only that petitioner should have procured some part of the Government business received by each of the eight corporations, of which it was paid a percentage. This is the rule set forth in *French* v. *War Contracts Price Adjustment Board, supra*, at 280. In other words, if the Edell partnership procured at least one Government contract for each of the eight corporations, then all of the profits derived by the partnership from commissions on Government contracts received by each of the eight corporations is subject to renegotiation, even if part of such commissions was paid on Government contracts which the partnership did not procure.

Petitioner had the burden of proof; it was obliged to establish that, with respect to each arrangement with a client, it did not solicit or

procure any Government contracts. This, petitioner has failed to do. On the contrary, the evidence shows affirmatively that petitioner did solicit and procure some Government contracts or subcontracts for each of the partnership's eight clients.

The *Wolff* and *Fine* cases, relied upon by petitioner, are readily distinguishable. In neither of those cases did the petitioners solicit or procure any Government contracts or subcontracts for their principals; their compensation was based or contingent upon the amount of the Government contracts or subcontracts procured by their principals, and not by them. In the instant case, the Edell partnership's compensation was based, or was contingent, at least in part, upon the amount of Government contracts or subcontracts procured by the partnership for each of its principals.

In the *Wolff* case, the petitioners were architects, and their duties were to prepare drawings of installations to be built for the Kaiser Co., and to issue invitations to bid on contracts for construction of such installations. In the *Fine* case, the petitioner's duties were to obtain and correlate technical information from airplane manufacturers to which the Raymond De-Icer Co. sold de-icing equipment, and to coordinate production schedules. The services performed by Edell were in no way similar; he clearly solicited and procured Government contracts or subcontracts.

Petitioner argues, also, that since it did not become entitled to any compensation until after one of the eight corporations had successfully completed a Government contract and had been paid by the Government, its compensation was not computed or contingent upon the amount of Government contracts it obtained for its principals. We are unable to follow petitioner's reasoning. Before Government contracts were successfully completed by the eight corporations and the corporations were paid by the Government, petitioner first procured the Government contracts, and it was ultimately paid a percentage of such Government contracts. Therefore, the amount of the partnership's compensation was, in the first instance, contingent upon its obtaining Government contracts for its principals, and it is immaterial that it had to wait for actual payment of its compensation until after the Government contract had been successfully completed and the principal paid by the Government, or even that its compensation might also be secondarily contingent upon such successful completion and payment.

Under arrangements between petitioner and each of eight corporations, the compensation received by petitioner was contingent or computed, at least in part, upon the amount of Government contracts which petitioner procured for each of the eight corporations, during the years 1943–1945, inclusive. It follows that petitioner was a sub-

contractor within the meaning of section 403 (a) (5) (B) (i), and that in each year it received income which is subject to renegotiation.

*Issue 2.* The next question is what amount, if any, of the profits derived by petitioner under the arrangements was excessive. The parties have stipulated that these net profits, before any allowance by the respondent of a reasonable amount for each year, amounted to $56,000, $104,000, and $140,000 for 1943, 1944, and 1945, respectively. Respondent contends that for each year $20,000 represents a reasonable profit. Petitioner claims that no part of its net profits for any year was excessive.

In their stipulation as to the amount of net profits derived from renegotiable business in each of the years 1943–1945, inclusive, the parties have allocated a net amount received in 1946 to the years involved, under section 403(h).[6] Cf. *Rosner* v. *W. C. P. A. B.*, 17 T. C. 445, 458–461.

There is no question to be decided relating to the allowance of a reasonable amount for the expenses of the partnership in each year. Respondent has allowed $14,000 for each year, and this allowance has been accepted by petitioner. Cf. *Greaves* v. *War Contracts Price Adjustment Board*, 10 T. C. 886, 891–893.

Petitioner contends that the amount of $300,000, the total amount of net profits for the 3 years involved, does not constitute excessive profits. In effect, petitioner asks the Court to consider the question under this issue as one which involves a determination of the total amount of excessive profits for 3 years considered together, rather than a determination of the amount of excessive profits for each of 3 years. At the outset, therefore, it is necessary to point out that the question must be considered with respect to each year, rather than with respect to one period of 3 years, under section 403 (c) (1).

In support of its contention that no part of its profits for any of the years involved was excessive, petitioner argues that the risks incurred and the capital used in its business were large because it had to defray its own expenses and it was not paid until after one of its clients had made delivery to the Government and had been paid by the Government; that the character of the services rendered by the

---

[6] SEC. 403 (h). This section shall apply only with respect to profits derived from contracts with the Departments and subcontracts which are determined under regulations prescribed by the Board to be reasonably allocable to performance prior to the close of the termination date. Notwithstanding the method of accounting employed by the contractor in keeping his books, profits determined to be so allocable shall be considered as having been received or accrued not later than the termination date. For the purposes of this subsection, the term "termination date" means whichever of the following date first occurs—

(1) December 31, 1945; or

(2) the date proclaimed by the President as the date of termination of hostilities in the present war; or

(3) the date specified in a concurrent resolution of the two Houses of Congress as the date of the termination of hostilities in the present war.

partners, as well as the time and effort expended by them, requires a high rate of compensation; and that the partnership should be credited with time and effort expended by Harry Edell in 1942 and in 1946, in work affecting the earnings of the partnership in 1943, 1944, and 1945, the years here involved.

Respondent, in support of its contention that all of the profits which exceed $20,000 per year are excessive, argues that petitioner acted simply as a conveyor of information from Government agencies to each of its eight clients.

Section 403 (a) (4) (A)[7] lists the factors to be taken into consideration in determining excessive profits. Since petitioner was not a manufacturer, some of the factors listed in section 403 (a) (4) (A) obviously are not relevant. Consideration has been given to the factors which are applicable to petitioner's business.

We do not think that petitioner incurred any substantial risks in its business. Although petitioner had to wait for its compensation until after the Government had paid its client, in the case of each Government contract it solicited or procured, the record establishes that the partnership enjoyed a high degree of certainty that it would ultimately receive commissions sufficient to cover all of its expenses and provide adequate compensation for the time of the partners, as well as a substantial profit.

The only capital which was used in petitioner's business is the amount of $5,000 loaned to the partnership by Lewis Edell. Petitioner has not offered any evidence to show that any other capital was used in the business. The partnership agreement provided for prompt repayment of this $5,000 to Lewis, as well as for division of all partnership profits. Petitioner has not shown that any partnership profits were retained in the business and used as capital. However, it is clear that some small capital was necessary to the conduct

---

[7] Sec. 403. (a) For the purposes of this section—

\* \* \* \* \* \*

(4) (A) The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this section to be excessive. In determining excessive profits there shall be taken into consideration the following factors:

(i) efficiency of contractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower;

(ii) reasonableness of costs and profits, with particular regard to volume of production, normal prewar earnings, and comparison of war and peacetime products;

(iii) amount and source of public and private capital employed and net worth;

(iv) extent of risk assumed, including the risk incident to reasonable pricing policies;

(v) nature and extent of contribution to the war effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(vi) character of business, including complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover;

(vii) such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

of petitioner's business, and our determination of the amount of excessive profits in each year includes an allowance for a reasonable return on such capital as is estimated to have been used in the business in each year.

The principal element in our determination of the amount of profits in each year which was not excessive, is the value of the personal services rendered by the partners. This includes primarily the services of Harry Edell. Lewis Edell performed only negligible services for the partnership. He was employed full time, during the years involved, as a sales agent for several sportswear manufacturers, and he devoted little time to the work of the partnership. On the other hand, Harry Edell devoted long hours each day to the work of the partnership, he worked on weekends, and he never took a vacation during the years involved.

Petitioner introduced the testimony of two management consultants, as expert witnesses, upon the value of the services performed by the Edell partnership. We have considered this testimony. We have considered, also, the fact that part of the profits of petitioner during 1943–1945, inclusive, was the result of work done by Harry Edell in 1942. Cf. *Armstrong* v. *War Contracts Price Adjustment Board*, 15 T. C. 625, 636–637, affirmed per curiam 194 F. 2d 875, certiorari denied 343 U. S. 967.

Although the services performed by Edell were not of a technical nature, and very little, if any, knowledge of engineering was required in their performance, the record establishes that the services performed had substantial value to the Government and to each of the partnership's eight clients. Executives of each of the eight companies lacked the ability to convert to war production and to fulfill Government requirements without the kind of assistance provided by Edell. By ascertaining what products each of the companies could produce for the Government with their existing plants and equipment, by obtaining technical and cost information for them, and by locating sources of supplies and machinery they required, Edell aided each of the companies to convert to war production, and to produce many goods necessary to the war effort. Thus, he made some contribution to the war effort.

Upon the whole record, we think that the amounts which the respondent determined to be excessive profits for each year, are too high. After a careful consideration of all of the evidence, it is found and concluded that the petitioner derived excessive profits from renegotiable income in the amounts of $26,000, $54,000, and $70,000 for the years 1943, 1944, and 1945, respectively.

*An order will be issued in accordance herewith.*