THE FINNIE COMPANY, A PARTNERSHIP, PETITIONER, *v.* UNITED STATES OF AMERICA, RESPONDENT.

Docket No. 665–R.    Filed March 24, 1959.

*W. Stuart McCloy, Esq.*, and *Lauch M. Magruder, Jr., Esq.*, for the petitioner.

*Beatrice M. Rosenhain, Esq.*, and *Andrew P. Vance, Esq.*, for the respondent.

TIETJENS, *Judge:* This proceeding involves a unilateral determination of the Renegotiation Board that the Finnie Company realized excessive profits in the amount of $95,000 for its fiscal year ended December 31, 1944.

The issues are: (1) Whether the Finnie Company, a partnership, and the Oliver-Finnie Company, a corporation, were under common control during 1944 within the meaning of section 403(c)(6) of the Renegotiation Act of 1943; (2) whether vacuum-packed salted peanuts are exempt from renegotiation as an agricultural commodity within the meaning of section 403(i)(1)(C) of the Renegotiation Act of 1943; if not (3) whether the proceeds from the sale of two carloads thereof, shipped f.o.b. destination on December 29, 1944, and received and accepted in January 1945, are renegotiable accruals for the year ended December 31, 1944; (4) whether the face amount of a termination claim received upon termination of a contract is subject to renegotiation, or only that portion which represents profit to the

contractor; and (5) what amount, if any, of excessive profits was realized during the year 1944.

Some of the facts were stipulated.

### FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

At all times material hereto, the Oliver-Finnie Company (hereinafter referred to as the corporation) was a Tennessee corporation engaged in the wholesale grocery, candy, and coffee business. Its shareholders, the number of shares held by them, and the ownership represented thereby were:

| Stockholder | Number of shares | Percentage of outstanding stock |
|---|---|---|
| R. M. Holt | 562 | 16.36 |
| Mrs. R. M. Holt | 1 | .03 |
| C. B. Trusty | 13 | .38 |
| W. W. Carson | 686 | 19.96 |
| Katherine Carson | 778 | 22.64 |
| Mrs. E. C. McIlwaine | 778 | 22.64 |
| Subtotal | 2,818 | 82.01 |
| Others | 618 | 17.99 |
| Total | 3,436 | 100.00 |

During 1944, R. M. Holt was president of the corporation, and C. B. Trusty and W. W. Carson, vice presidents. The corporation had renegotiable sales in excess of $300,000 for its fiscal year ended December 31, 1944.

In 1943, the corporation was requested by the Chemical Warfare Service, Department of the Army, to undertake a contract for the production of the M1 field impregnating sets, which were designed to impregnate the clothing of military personnel to protect them from enemy gas attack. On August 19, 1943, the corporate board of directors voted to reject the proposed contract inasmuch as it was not directly related to the candy or coffee business, and further because the possible net gain was too little to justify what they considered to be the risks involved. However, impressed with the need for these sets, Holt set about to find a means by which they could be produced. During August of 1943, he sent letters to the corporation's stockholders proposing the formation of a limited partnership to undertake the contract. The proposal was rejected by many of the stockholders, and was not put into effect. Thereupon, Holt approached some of his friends, in addition to the corporate stockholders, suggesting the formation of a general partnership to handle the contract. The plan was accepted, and on September 1, 1943, the Finnie Com-

pany (hereinafter referred to as the petitioner) was organized for the purpose of entering into the proposed contract.

As organized, petitioner's members, their capital contributions, and their partnership interests were:

| Partner | Capital contribution | Partnership interest |
|---|---|---|
| | | Per cent |
| R. M. Holt | $5,800.00 | 11.6 |
| Mrs. R. M. Holt | 5,800.00 | 11.6 |
| C. B. Trusty | 3,257.40 | 6.52 |
| Mrs. C. B. Trusty | 2,500.00 | 5 |
| Katherine Carson | 11,321.30 | 22.64 |
| Mrs. E. C. McIlwaine | 11,321.30 | 22.64 |
| Mrs. Elizabeth N. Carson | 10,000.00 | 20 |

Katherine Carson and Emma C. McIlwaine were sisters. Elizabeth N. Carson was their sister-in-law and wife of William W. Carson. R. M. Holt was designated general manager, and C. B. Trusty, assistant general manager.

During 1943 petitioner received, through the Union Planters National Bank and Trust Company, a "V" loan from the Department of the Army in the amount of $300,000, the amount of which was increased to $850,000 in 1944. In order to obtain this loan, Union Planters required each partner, as well as William W. Carson, to guarantee petitioner's obligation.

Petitioner leased certain space to commence production of the impregnating sets, a portion of which was located in a building owned and operated by the corporation. Other leased areas included three buildings, and two lots used for storage purposes.

Petitioner and the corporation were under common control during 1944 within the meaning of section 403(c)(6) of the Renegotiation Act of 1943.

In August 1943, the Chemical Warfare Service issued a letter of intent to petitioner directing it to obtain the necessary materials to commence production of 98,000 impregnating sets at a unit price of $8 per set. The letter also contained a repricing clause which was effective after a run of 25,000 sets. On December 30, 1943, this letter of intent was replaced by a contract, which, as subsequently amended, provided for a total of 100,531 sets. The final invoice under this contract was dated January 24, 1944, and the contract was completed on February 11, 1944. During 1944, petitioner received payments under this contract in the amount of $122,326.05.

On September 30, 1943, petitioner entered into a similar contract with the Chemical Warfare Service. However, before actual production commenced, petitioner received a suspension order. On January 6, 1944, this contract was terminated by the parties by agreement. As finally agreed upon, petitioner received in 1944 the sum of $74,882.35

for "all its costs, expenditures, liabilities, commitments and work done pursuant to said contract," which was composed of the following:

Payment in full for materials, equipment and items to be delivered to the Government_____ $41,111.09

Payment in full compensation to the contractor for the uncompleted portion of the contract, including, without limitation, a reasonable allowance for profit for work actually done_____ 23,370.46

Payment in full for expenditures made and costs incurred after termination notice in connection with the settlement of the contract, including all interest to which the contractor is entitled under the Contract Settlement Act of 1944 to the date of payment_ 10,400.80

Total_____ 74,882.35

On its books petitioner accrued a net profit of $15,004.03 as having been realized in 1944 under this agreement.

Production under the first contract entered into called for the filling of three containers with certain chemicals, and the packing of those containers, along with accessories such as disks, dye, hank rope, canvas, nuts and bolts, a cotton bag, and an instruction card, into a plywood case. In total, some 20 items were involved in each set. The entire operation was classified under security regulations, as a result of which petitioner did not learn of the complete nature of the work until after execution of the contract. To assist it in the performance of this contract, petitioner received some $4,000,000 of "free-issue" equipment from the Government.

One of the chemicals involved was designated as XXCC3, a chlorine-emitting compound in a fine powdery form. This substance decomposes at temperatures in excess of 110 degrees Fahrenheit. During decomposition it smoulders without giving off much heat, and emits heavy smoke and obnoxious fumes composed primarily of free chlorine and hydrogen chloride. In handling this chemical, cleanliness and good housekeeping habits are essentials.

In packing XXCC3 into its specified containers, an overfill resulted and since the chemical was in powder form it had a tendency to get into the pores of the workers' skin and cause a burn. Certain precautions therefore had to be taken, such as providing protective clothing for the workers. A further problem which was encountered was the fact that any dust containing XXCC3 was subject to ignition, even by a lighted electric bulb.

Early one morning in November 1943, smoke was discovered coming out of one of petitioner's buildings. Water was poured on the origin of the smoke, and firemen entered the building. However, being unaware of the nature of the chemicals stored therein the firemen did not use their gas masks, and some of them were felled by

chlorine gas. Only a small area of the building was involved in this incident. Thereafter, certain tests were conducted with the chemical by petitioner and representatives of the Chemical Warfare Safety Division and the Memphis Fire Department to devise means of containing any future ignitions. The chemical was ignited, and attempts were made to extinguish it with carbon dioxide, water, and sand, no one of which was successful. During the conduct of these tests, petitioner's managing partner, R. M. Holt, was gassed and had to be hospitalized. During November and December of 1943, petitioner received certain communications from the Chemical Warfare Service relative to the thermal decomposition of XXCC3, and various safety measures which should accompany its handling. The Memphis Fire Department expressed its concern with respect to storage of this chemical on petitioner's premises.

Upon becoming aware of the risk attendant upon the use of XXCC3, petitioner's partners decided that if there were any way in which they could withdraw from the operation it should be accomplished. Various conferences were held with the contracting officers, as a result of which the urgent need for the completion of the contract was made known. It was therefore decided that petitioner should continue production. Due to the urgency of the project, an accelerated work program, consisting of a 24-hour day 7-day week work schedule, was instituted.

Pursuant to the repricing clause contained in the contract, petitioner and the contracting authority agreed to decrease the contract price from $8 per set to $7.35 per set. During 1943, petitioner delivered 83,890 sets upon which it realized a net profit of $93,208.11. During 1944, petitioner delivered 16,643 sets, upon which it realized a net profit of $40,187.46. None of the 100,533 impregnating sets produced by petitioner under this contract was rejected by the Chemical Warfare Service.

In 1944, after completion of the Chemical Warfare Service contract, petitioner entered into a series of prime contracts for the delivery of canned peanuts to the Government. Before commencing actual production under these contracts, petitioner found it necessary to secure a further loan from Union Planters National Bank. In applying for this loan certain financial statements were prepared with respect to anticipated production costs and profits under the peanut contracts. On one such statement petitioner estimated that it would derive a minimum profit from these operations of 3 cents per can of peanuts.

Due to the dissimilarity of production methods utilized under the peanut contracts and the Chemical Warfare Service contract, petitioner found it necessary to make substantial changes in the operating

system of its plant. Certain new equipment had to be purchased which proved rather difficult in the light of existing wartime controls.

Pursuant to these contracts petitioner located and purchased the proper grade of peanuts, which were then sorted, the impurities and defectives removed, and the peanuts then roasted in oil, salted, cooled, packed in 8-ounce vacuum cans, and crated for shipment. Petitioner purchased only shelled nuts which it acquired directly from various shelling mills. These mills in turn obtained their peanuts from the grower in their raw shell state.

No unusual production techniques were utilized in performing these contracts, nor did they require the use of skilled labor. While there was always present the danger of infestation of the stored nuts by rodents and insects, this was easily avoided by the use of hygienic storage methods. In 1944, petitioner produced a total of 2,109,254 8-ounce cans of peanuts without a single rejection.

The contracts under which these peanuts were produced provided that the canned, processed peanuts were to be delivered freight prepaid by petitioner to their point of destination. They further provided that final inspection and acceptance were to be made by the contracting authority at the point of destination. On December 29, 1944, two railroad carloads of peanuts, priced at $24,872.68, were shipped by petitioner f.o.b. New Orleans Port of Embarkation. These shipments were received and accepted at their destination on January 3 and 7, 1945. On its books, petitioner accrued these shipments as sales occurring in 1944.

During 1944, petitioner's purchases of peanuts amounted to $721,101.13. In addition to the two carloads referred to above, it accrued peanut sales to the Government for that year in the amount of $305,555.88. On its total peanut sales to the Government so accrued for 1944 it realized a net profit of $95,800.

At all times material hereto petitioner's books have been kept on an accrual basis. In 1944, its "renegotiable" and "nonrenegotiable" sales,[1] its net profits, and the percentage of its net profits to sales before and after renegotiation were:

| | Before renegotiation | | Total | After renegotiation | | Total |
|---|---|---|---|---|---|---|
| | Renego-tiable | Nonrene-gotiable | | Renego-tiable | Nonrene-gotiable | |
| Sales | $527,637 | [1] $16,490 | $544,127 | $432,637 | $16,490 | $449,127 |
| Net profit | $150,991 | $4,764 | $155,755 | $55,991 | $4,764 | $60,755 |
| Percentage | 28.61 | 28.8 | 28.6 | 12.9 | 28.8 | 13.5 |

[1] Of this amount $16,054 represented sales of salted peanuts to the corporation and its subsidiary.

[1] The terms "renegotiable" and "nonrenegotiable" are used for convenience only, and are not intended to represent conclusions as to the amount of petitioner's renegotiable sales during the year in issue.

Petitioner's invested capital and net worth as of the beginning and the close of 1944 were as follows:

| 1944 | Invested capital | Net worth |
|---|---|---|
| Jan. 1 | $50,000 | $136,609 |
| Dec. 31 | 50,000 | 210,889 |

Petitioner realized excessive profits from renegotiable contracts during 1944 in the amount of $50,000.

### OPINION.

At the outset, a brief discussion of an evidentiary matter raised by petitioner seems pertinent. As support for many of its proposed findings of fact, petitioner has referred us to the report of its renegotiation for the year 1943 issued by the War Department, Chief, Chemical Warfare Service, and to the report of its renegotiation for the year 1944 issued by the War Department, Price Adjustment Board. Both these reports have been submitted in evidence as stipulated exhibits. However, neither report is a statutory statement such as provided by section 403(c)(1) of the 1943 Renegotiation Act,[2] and thus they are not within the prohibition against use in a proceeding before this Court.

Though these reports may be competent to prove the conclusions reached by the issuing authorities, these conclusions are not binding on this Court since we do not have in evidence the facts which formed the basis of the conclusions. In any event, by statutory directive, a proceeding in this Court to determine the amount, if any, of excessive profits is not a proceeding to review the determination of the Renegotiation Board, or any interdepartmental determination. Rather, it is a proceeding *de novo*, in which the burden of proof is upon the petitioner, except that in respect to any new matter pleaded in the answer it is upon the respondent, a burden which is placed there by Rule 32 of the Tax Court Rules of Practice, and not by any presumptive correctness attaching to the determination of the Board. *Nathan Cohen* v. *Secretary of War*, 7 T.C. 1002 (1946). We are of the opinion that petitioner has not carried that burden with respect to those matters where it relies solely upon these interdepartmental reports concerning its renegotiation. Thus, we have been unable to make many of the findings requested by it.

The first issue presented for our consideration is whether, during 1944, petitioner was under common control with the Oliver-Finnie

---

[2] Sec. 403(c)(1). * * * Whenever the Board makes a determination with respect to the amount of excessive profits * * * it shall, at the request of the contractor * * * prepare and furnish such contractor * * * with a statement of such determination, of the facts used as a basis therefor, and of its reasons for such determination. Such statement shall not be used in the Tax Court of the United States as proof of the facts or conclusions stated therein.

Company within the meaning of section 403(c)(6) of the 1943 Act.[3] If so, then in deciding whether petitioner's sales exceed the jurisdictional minimum of $500,000, they are to be combined with the renegotiable sales of that corporation, which have been stipulated to have been in excess of $300,000.

The question of control is one of fact, and is to be decided on the basis of the record as a whole. *Warner* v. *War Contracts Price Adjst. Board*, 14 T.C. 1320 (1950). The regulations set forth in the Renegotiation Manuals for the fiscal years ending after June 30, 1943, define "control" in part as follows:

348.4  Tests of "Control". In determining whether the contractor controls or is controlled by or under common control with another person, the following principles should be followed:

*     *     *     *     *     *

(5) *Other cases:* Actual control is a question of fact. Whenever it is believed that actual control exists even though the foregoing conditions are not fulfilled, the matter may be determined by the Department or Service conducting the renegotiation.

A review of the record reveals that petitioner's partners directly held 62 per cent of the outstanding stock of the corporation. Though W. W. Carson, a corporate vice president and holder of a 19.96 per cent stock interest therein, was not among petitioner's partners, his wife, Elizabeth N. Carson, had a 20 per cent interest in the partnership. On other occasions we have recognized the influence of the family relationship upon the various individuals under consideration, and we are not persuaded to do otherwise on this record. Cf. *Lowell Wool By-Prod. Co.* v. *War Cont. Price Adj. Bd.*, 14 T.C. 1398 (1950). Thus, at least 82 per cent of the corporation's stock was held by petitioner's partners or those directly related to them. Moreover, both petitioner's managing partners served in an executive capacity with the corporation; one being its president, and the other a vice president. In the light of these and other facts of record, we have concluded, and have found that petitioner and the corporation were under common control within the meaning of section 403(c)(6) of the Act. The fact that each business may have been conducted as a separate entity, and no effort made to integrate their activities, is immaterial. *Hoffman* v. *United States*, 23 T.C. 569 (1954). Therefore, the sales of petitioner and the corporation are to be aggregated

---

[3] "This subsection shall be applicable to all contracts and subcontracts, to the extent of the amounts received or accrued thereunder in any fiscal year ending after June 30, 1943 * * * unless * * * (B) the aggregate of the amounts received or accrued in such fiscal year by the contractor or subcontractor and all persons under the control of or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts (* * *) do not exceed $500,000 * * *. If such fiscal year is a fractional part of twelve months, the $500,000 amount * * * shall be reduced to the same fractional part thereof for the purposes of this paragraph."

in deciding whether petitioner is subject to renegotiation by virtue of exceeding the jurisdictional minimum of $500,000.

The next issue is whether petitioner's contracts to deliver 8-ounce cans of salted, roasted peanuts constituted contracts for the delivery of an agricultural commodity within the meaning of section 403(i)(1)(C) of the 1943 Act,[4] and thus exempt from re-negotiation. Petitioner argues that there is no established market for peanuts in their raw shell state, and that they are customarily sold only after the processes of salting and roasting.

During 1944, petitioner purchased some $720,000 worth of shelled peanuts from various shelling mills in order to meet its commitments under these contracts. Those mills in turn had acquired the peanuts in their unshelled state from the growers. Furthermore, the Chief of the Commodities Program Branch, the Oils and Peanuts Division, United States Department of Agriculture, appearing as an expert witness for respondent, testified that in his opinion the first estab-lished market for peanuts is the sale of the peanut in its raw shell state by the grower to the shellers or cleaners. Thus, on the basis of petitioner's own experience, and in the light of the expert testimony presented, we must reject petitioner's contentions, and hold that its contracts, calling for the delivery of 8-ounce vacuum packed cans of shelled, salted, roasted peanuts, were not exempt contracts within the meaning of section 403(i)(1)(C) of the Act.

Having decided that petitioner's peanut contracts were not exempt from renegotiation, we next must decide the amount properly accru-able thereunder during the year 1944. Petitioner concedes accruals for that year in the amount of $305,555.88. However, it maintains that the amount of $24,872.68, representing the contract price of the two rail-car loads of peanuts shipped in December 1944, and not re-ceived until January 1945, were erroneously accrued as 1944 sales. It contends that inasmuch as the contracts in issue provided that the peanuts were to be shipped f.o.b. destination, and that inspection and acceptance were to be made by the contracting authority at the point of such destination, title to the goods did not pass until delivery and acceptance. Since this did not occur until January 1945, its position is that the sale of the two carloads was not consummated until that time, and thus not a proper accrual for the year ended December 31, 1944.

---

[4] Sec. 403(i)(1). The provisions of this section shall not apply to—

    \*        \*        \*        \*        \*        \*        \*

(C) any contract or subcontract for an agricultural commodity in its raw or natural state, or if the commodity is not customarily sold or has not an established market in its raw or natural state, in the first form or state, beyond the raw or natural state, in which it is customarily sold or in which it has an established market. \* \* \*

Section 403(c)(6) of the Act provides that it shall be applicable to all contracts to the extent of the amounts received or accrued thereunder during any fiscal year. Section 403(a)(9) further provides that the terms "received or accrued" are to be construed in accordance with the method of accounting used by the contractor in keeping his books. Petitioner kept its books on an accrual basis, and therefore this issue is to be resolved according to the concepts of accrual accounting.

It is fundamental that an item does not accrue as income until all the events fixing the amount due and the liability to pay have occurred. *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182 (1934), rehearing denied 292 U.S. 613 (1934). It is likewise fundamental that the income derived by a seller of goods is derived from the actual sale of the property, an event which occurs when title thereto passes to the purchaser. See *American Food Products Corporation*, 28 T.C. 14 (1957), and cases cited therein. It is well settled that where a contract calls for the shipment of specific goods f.o.b. destination, title is presumed not to pass until the goods have reached the destination indicated. *Larry Lightner, Inc.* v. *United States*, 213 F. 2d 449 (C.A. 5, 1954); 2 Williston, Sales sec. 280b, p. 98 (rev. ed.). Thus, under the terms of the present contract calling for the shipment of the goods f.o.b. destination, title did not pass, and the sale was not consummated until the peanuts were actually received. That this was the intention of the parties is evident from the contractual provisions calling for inspection and acceptance at the point of destination. Since receipt of the two carloads presently under consideration did not occur until January 1945, the income derived therefrom was not a proper accrual before that time. It therefore follows that the amount of $24,872.68 did not constitute a renegotiable accrual for 1944 within the meaning of section 403(c)(6) of the Act.

That petitioner reflected this item on its books as a 1944 accrual does not change the result. That was an improper accrual, since title to the goods did not pass during that year. An erroneous bookkeeping entry such as this is in no way controlling over the actual facts of the transaction. See *W. L. Moody Cotton Co.*, 2 T.C. 347 (1943), affd. 143 F. 2d 712 (C.A. 5, 1944).

There is no dispute that petitioner properly accrued the amount of $122,326.05 as its renegotiable receipts in 1944 under the first Chemical Warfare Service contract. In the light of our holdings on the above issues, there is to be added to that figure, for the purposes of deciding whether petitioner's receipts for that year exceeded the statutory minimum of $500,000, the $305,555.58 accrued under its peanut contracts, and the corporation's $300,000 of renegotiable sales. It is therefore apparent that petitioner was subject to renegotiation for 1944.

Accordingly, we need not consider its fourth contention that only that portion of its termination award of $74,882.35 as represented profit to it is a renegotiable accrual for 1944 in computing the jurisdictional minimum.

By amended petition, petitioner makes the following allegation:

The Commissioner of Internal Revenue * * * assessed deficiencies against certain of the partners * * * after disallowing certain deductions taken by the partnership in the years 1943, 1944 and 1945 and after denying the existence of a valid partnership. Petitions * * * were filed * * * and * * * consolidated under the style of Emma C. McIlwaine * * *. After a hearing on the merits, The Tax Court in its memorandum findings of fact and opinion entered September 29, 1952, held that the partners * * * were those persons * * * stated in the agreement * * * [and] * * * determined the net partnership income for the year 1944 to be $72,791.58 after all adjustments, instead of the $80,173.68 (adjusted for the $95,000 renegotiation) shown on the original partnership return or a reduction of approximately $7,382.10. * * *

On brief petitioner contends adjustment must now be made to its net profits in the light of the outcome of that proceeding. The short answer to this is that we have been presented with no evidence indicating that our prior decision resulted in any such alleged reduction, and, further, that no computation has been presented which would substantiate the amount now contended for. Morever, petitioner has offered no reason why an adjustment is now necessary. We therefore have not considered these contentions in arriving at our decision herein.

The final issue is the amount, if any, of excessive profits realized by petitioner during 1944 under its renegotiable contracts. The record indicates that it accrued receipts under its Chemical Warfare Service contracts for that year in the amount of $197,208.40, and net profits of $55,191.49, or a net profit of 28 per cent. It further reveals that it received accruals of $305,555.58 during that year under its peanut contracts, upon which it realized net profits of $88,515,[5] or a net profit of 29 per cent. On its total renegotiable receipts for that year of $502,764 it realized net profits of $143,706, for a net profit percentage of 29 per cent.

Certain of the various statutory facts which are to be considered [6] in deciding whether profits realized were excessive must be interpreted in petitioner's favor. Foremost among these is the extent of risk which it assumed in handling the chemical XXCC3. While respondent minimizes the hazards attendant upon the use of this sub-

[5] Since we have excluded $24,872.68 of its accrued peanut sales from 1944 renegotiable receipts, an adjustment to accrued net profit was necessary. We therefore have decreased petitioner's total net profits of $95,800 accrued on its peanut sales during 1944 by the ratio which $24,872 bears to $330,428 (proper 1944 accruals of $305,555 plus $24,872.68), or 0.075 per cent.

[6] See sec. 403(a)(4)(A) of the 1943 Act.

stance, we recognize its position is based primarily upon the chemical as it is known today, and not as it was known by the immediate parties to the contracts during the period in issue. We are satisfied that during late 1943 and early 1944, neither the War Department, nor the petitioner, had reached a satisfactory evaluation of the danger potential of XXCC3, or had derived a simple procedure for containing its ignition. Certainly in practice petitioner encountered the direct effects of its worst propensities. In fact, had it not been for the urgings of the contracting authorities, it appears that the contract would have been terminated because of the risk involved.

A second factor which weighs in petitioner's favor, is the fact that under all its contracts it experienced not one rejection. While it may be argued that this would indicate that it only was doing the job contracted for, we believe under the circumstances of this record some consideration should be accorded it.

On the other hand, we note that with respect to its Chemical Warfare Service contracts petitioner was the recipient of some $4,000,000 of "free-issue" equipment, nevertheless the benefits accruing to petitioner through its use far outweighed any disadvantages. Furthermore, the production procedures under both the Chemical Warfare Service contracts and the peanut contracts were routine in nature. While the former involved primarily the mere assembly of equipment, the latter entailed the relatively simple processes of sorting, roasting, salting, packing, and crating for shipment. Moreover, petitioner's managing partners brought with them the benefit of the corporation's many years of experience in an allied field.

Having taken these, and the other statutory factors into consideration, including, but not limited to the amount of private capital involved, the relationship of profits to net worth, and the reasonableness of the profits realized, we have concluded, and have found that petitioner realized excessive profits from renegotiable contracts during the year 1944 in the amount of $50,000.

*An order will issue in accordance herewith.*