OPINION. Turner, Judge: Respondent determined that the Thorson Company realized $15,000 excessive profits in 1954. Petitioners have instituted this proceeding alleging that no part of the profits realized by the partnership in 1954 was excessive within the meaning of the Renegotiation Act of 1951, as amended. Respondent makes no claim that the profits in excess of $15,000 were excessive. This is a de novo proceeding and the Court, from the evidence of record, guided by the Renegotiation Act, the rules and regulations promulgated by the respondent pursuant to the Act, and the Court’s own decisions, is to determine to what extent, if any, the Thorson Company realized excessive profits in the year in question. Boeing Co. v. Renegotiation Board, 37 T.C. 613; Finnie Co. v. United. States, 31 T.C. 1182; Vaughn Machinery. Co. v. Renegotiation Board, 30 T.C. 949; Trace v. United States, 25 T.C. 538. The “person” subject to the Renegotiation Act is defined in section 103 (j) as “an individual, firm, corporation, association, partnership, and any organized group of persons whether or not incorporated.” The renegotiable profits of a partnership are, therefore, subject to renegotiation, that is, the partnership entity is to be renegotiated and not the individual partners. We do not understand respondent contends otherwise. The phrase “profits derived from contracts with the Departments and subcontracts” as used in section 103(e) of the Renegotiation Act is defined in section 103(f) as “the excess of the amount received or accrued under such contracts and subcontracts over the costs paid or incurred with respect thereto and determined to be allocable thereto.”. It thus appears that all and not a segment of the partnership’s renegotiable profits are renegotiable. While the partnership was rendering its services to different manufacturers under separate contracts, respondent is not contending that each contract should be renegotiated. In their endeavor to show that the partnership did not realize $15,000, or a lesser amount, in excessive profits during 1954, petitioners have produced quite a bit of testimony relating to the technical services rendered by the partnership and the development of certain devices that were engineered by both the manufacturers and their particular customers. In relation to the time of the services and the development of many articles or devices to which services were rendered by the partnership, the testimony is, in the main, of a general nature extending over periods of time other than the year under review and not specific as to actual services rendered during the year in question. The facts as shown from the evidence are set forth in our Findings of Fact, and need not be related again. It is not necessary, as we are of the opinion that petitioners have failed to prove that all profits realized by their partnership were reasonable. •The evidence shows that the technical services rendered by the partnership were performed by persons employed by the partnership for such purposes, not the partners; that the partners not only performed no personal and technical services for the manufacturers the partnership represented, but rendered very little clerical assistance, working an average of only 1 hour a day for 5 days a week; that the petitioners contributed little, if any, financial aid to the partnership; and that the renegotiable commissions, the renegotiable costs, and the renegotiable profits of the partnership for 1954 were respectively $120,896.35, $84,473.03, and $36,423.32. Ordinarily, where partners are engaged hi the business of representing manufacturers they render personal services themselves, and expect to receive as compensation for their services a share of the profits realized by the partnership from such services, which profits, to the extent they are not excessive, are the value of the partners’ services. Edell v. United States, 28 T.C. 601; Trace v. United States, supra; Greaves v. War Contracts Price Adjustment Board, 10 T.C. 886. In the instant case, the evidence shows that the petitioners, as partners of the Thorson partnership, rendered no technical or personal services to the principals on behalf of Thorson. The only services they rendered consisted of a small amount of clerical assistance which, if placed on a salary basis, would justify only a small amount of compensation. To justify petitioners’ contention that the profits of the partnership are reasonable, we look to see what other contributions the partners made to the partnership. It may be that large financial contributions at great risks would justify, in the circumstances, greater profits for the partners, regardless of the small amount of personal services they rendered. The evidence shows, however, that petitioners made no contributions to the partnership’s capital and very little, if any, of their profits were retained in the partnership. In fact, they paid no consideration, for tbeir respective partnership interests and were protected from any liability by their brother George assuming all liabilities, both the liabilities of the prior partnership and the subsequent liabilities of the petitioners’ partnership. The evidence shows that at the end of 1951, the last year of the first partnership, there was a deficit in the capital account of $722.72, and at the beginning of the year 1952, the first year of the second partnership, the capital account was shown to be the aggregate amount of $1,277.28, or $635.64 for each partner. It thus appears that $2,000 was advanced in order to pay the deficit of the first partnership and to leave the remainder for the capital account of the second partnership. The evidence does not indicate who contributed the $2,000, but it does indicate that the petitioners did not. It could be that George made the advancement, since he was a partner of the first partnership which had incurred the deficit and in the creation of the second partnership he agreed to pay all liabilities of both partnerships. The partnership’s ordinary net income for 1952 is shown in the aggregate amount of $17,625.04, or $8,812.52 for each partner, and it is further shown that there were withdrawals during the year of $1,000 by each partner, or a total of $2,000, the equivalent of the capital put up at the beginning of the year. The capital account at the end of the year and at the beginning of 1953, is shown as $8,451.16 for each partner, or an aggregate amount of $16,902.32. The partnership’s ordinary net income for 1953 aggregated $16,105.86, or $8,052.93 for each partner. Withdrawals totaling $15,000, or $7,500 for each partner, were made during 1953, leaving to the capital account at the end of the year the aggregate amount of $18,008.19, or $9,004.09 for each partner, which amounts were also shown as the partnership’s capital account at the beginning .of 1954, the year under review, and which amounts were withdrawn by the partners during the year. The books of the partnership show that the ordinary net income for 1954 aggregated $32,846.39, or $16,423.20 for each partner, which amounts were also shown to be the capital accomit of the partnership at the end of the year and which amounts were withdrawn on or about February 1, 1955. It is apparent that by February 1955, all profits realized by the partnership during the 3 years of its operation had been withdrawn; that petitioners had no investment in the partnership ; and that to them there was no investment risk. It thus appears that petitioners having contributed so little personally and financially to the partnership, the value of their services is correspondingly little. On the other hand, it appears that the value of the partnership’s services to the principals by the employees may be measured by the costs of their services. Both parties agree that the renegotiate costs of $84,473.03 are reasonable, particularly with respect to the compensation paid those rendering sales-engineering services, which, included the “discretionary profit participation compensation” in the aggregate amount of $20,000 paid to George and C. J. The partnership and the employees apparently agreed that the compensation paid and received was reasonable. Respondent does suggest that C. J. did not earn the $22,000 he received as compensation, as he was ill during the last 9 months of the year and for which period he received “sickness salary” and for which period he claimed “salary exclusion” on his return. Respondent suggests that C. J. was paid more for services he rendered during the first 3 months of 1954 than he was paid for 12 months of service during 1953. However, no issue is raised, respondent merely pointing out its liberal action in allowing the full amount of C. J.’s compensation as part of the partnership’s costs. Also, no issue is raised as to the compensation paid to George. The evidence shows that he received compensation of $25,000 for his services during 1954, but it also shows that he expended over $15,000 for expenses of the partnership for which he was not reimbursed. Why an employee should pay such a large amount of the partnership’s expense and not be reimbursed is not explained, but it is shown that on audit of George’s 1954 income tax return the Internal Revenue Service allowed as a deduction the amount of expense George paid personally on behalf of the partnership. The net aggregate of approximately $32,000 received by C. J. and George as compensation is considerably more than the aggregate of approximately $16,000 received as compensation by the two other sales engineers for their services. Petitioners state that limiting the value of the partnership’s services to the amount of cost of the services would result in not permitting the partnership to have a profit, when the Renegotiation Act and respondent’s own regulations expect a contractor to realize a profit; that all that would have to be determined would be the reasonableness of salaries; that the petitioners should be treated as stockholders of a corporation who render little or no service to the corporation, and that they should be permitted to retain the profits of the partnership earned, whatever was the contribution of the individual partners to the partnership. There is a difference in the entity of a partnership and that of a corporation, just as there is a difference in the entity of both to an individual, but whether a renegotiable contractor is an individual, a partnership, or a corporation, he is not permitted to realize excessive profits. That is the purpose of the Renegotiation Act. In determining whether profits are excessive or not, there may be occasions to determine if salaries are reasonable, though the contractor be an individual, a partnership, a corporation, or any other entity. See Trace v. United, States, sufra; Waltham Screw Co. v. Renegotiation Board, 31 T.C. 227; Stein Brothers Mfg. Co. v. Secretary of War, 7 T.C. 863. But, as shown in these cases, a determination that salaries are unreasonable does not deprive the contractor of all profits. Nor is the respondent contending here that the Thorson partnership is entitled to no profits. Our question does not concern reasonableness or unreasonableness of salaries. The parties are in agreement that all costs, including salaries, of the partnership during the year in question were reasonable. The Renegotiation Act sets forth factors that are to be considered in determining excessive profits and to the extent that such factors can be applied to a business such as that of the Thorson partnership, they have been taken into consideration. After careful consideration of all evidence of record, we conclude, as we have found as a fact, that of the $86,423.32 renegotiable net income realized by the Thorson Company during the year 1954, at least $15,000 represented excessive profits. An order will be issued in accordance herewith.